**Karla L. COSSEY and William Cossey, Plaintiffs,**

v.

**ASSOCIATES' HEALTH AND WELFARE PLAN; and Administrative Committee, Associates' Health and Welfare Plan, Defendants.**

No. 4:02CV661 WKU.

United States District Court,
E.D. Arkansas,
Western Division.

March 15, 2005.

Amended Complaint against Defendants Associates' Health and Welfare Plan ("the Plan") and Administrative Committee, Associates' Health and Welfare Plan ("the Committee"), alleging violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA). (*See* filing 121 at 15–16 (citing 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2), and 1132(a)(3)).) Now before me are the Plaintiffs' Motion for Summary Judgment, (filing 91), and its associated filings; the Defendants Motion to Affirm the Determination of the Administrative Committee or, Alternatively, Motion for Summary Judgment, (filing 18), and its associated filings; the Defendants' Supplemental Motion to Affirm the Determination of the Administrative Committee or, Alternatively, Motion for Summary Judgment, (filing 105), and its associated filings; and the Defendants' Motion for Summary Judgment on Plaintiffs' Statutory Penalty Claim, (filing 67), and its associated filings. My analysis of these motions is set forth below.

## I. BACKGROUND

The Plan, which was created by Wal–Mart Stores, Inc. "to provide medical benefits to its employees," (filing 19 at 2), is an employee welfare benefit plan governed by ERISA. The Committee is the administrator and fiduciary of the Plan.

Leon Marks, Attorney at Law, Little Rock, AR, Will Bond, Bond & Chamberlin, Jacksonville, AR, for Plaintiffs.

John M. Russell, Edwin L. Rawson, Lawrence & Russell, LLP, Memphis, TN, for Defendants.

### MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

URBOM, Senior District Judge.

On April 26, 2004, the plaintiffs, Karla and William Cossey, filed their Sixth

Plaintiff William Cossey is an employee of Wal–Mart Stores, Inc. Both he and his wife, Plaintiff Karla Cossey, are "covered persons"—that is, they are both eligible for benefits under the Plan. In October 2001, Karla Cossey was injured in a car accident. She retained counsel to represent her in a personal injury action, and a complaint was filed in the Circuit Court of Lonoke County in April 2002.

There appears to be no dispute that, as a general matter, the medical expenses associated with Karla Cossey's injuries are

within the Plan's coverage. (*See, e.g.,* Administrative Record (A.R.), filing 32, at 167 42 ("Your medical coverage will pay for a variety of hospital and other medical charges incurred because of ... accidental injury.").) In May 2002, as bills for the treatment of Karla Cossey's injuries began to issue, the "Wal–Mart Claims Administration Reimbursement Department" requested information about Karla Cossey's accident. (*See* filing 94, Ex. 13 at 002–003.)[1] Karla Cossey's counsel responded with a letter dated May 30, 2002, wherein he invited the Reimbursement Department to contact him via telephone to discuss the accident. (*See* A.R., filing 32, at 167 201.) A "Reimbursement Specialist" replied via letter dated June 4, 2002. (*See id.* at 167 202.) This letter states, in pertinent part,

> I am in receipt of your letter dated May 30, 2002. Please be advised that before we will be able to process Ms. Cossey's accident related claims, we will need you to fill out the enclosed reimbursement/subrogation forms and have Ms. Cossey sign the form. Additionally we need you to sign the enclosed disbursement agreement and return these items....
>
> If any of this information is not received in our office, we will be unable to process Ms. Cossey's claims.

(A.R., filing 32, at 167 202.)[2]

Counsel responded via fax dated June 11, 2002, and objected to the Plan's refusal to pay benefits absent his and Karla Cossey's execution of the "reimbursement/subrogation forms" and "disbursement agreements." His response states, *inter alia,*

> You state in your letter that you will be "unable" to continue processing Karla's health care claims unless both she and I sign the subrogation contracts that you provided with your letter. Your subrogation contracts would create a cause of action, which does not presently exist, allowing your Plan to sue both Karla and me for breach of contract if we disagree at the end of the case to the rightful amount of your claim for reimbursement....
>
> This firm and our co-counsel ... are responsible for looking after the best interests of Karla, not those of your Plan. It is possible that we will disagree with you at the end of this case as to how much you are entitled to take away from Karla in the name of subrogation. Thus, you are effectively insisting that we forfeit our ability to pursue Karla's best interests by contractually agreeing to pay you whatever you may demand at the end of this case, no matter whether or not we agree that your demand is fair to Karla....

(A.R., filing 32, at 167 204) (citing *Southern Council of Industrial Workers v. Ford,* 83 F.3d 966 (8th Cir.1996).) Counsel requested that the Plan provide authority for its position that it could refuse to pay benefits to Karla Cossey absent her and

---

**1.** The defendants argue that since this request was not included in the Administrative Record, it ought not be considered. (*See* filing 108 at 8, ¶ 41.) In response to the defendants' objection, I note that this document carries little, if any, substantive importance, and I have considered it only for the purpose of describing the context of the present controversy; a document that *does* appear in the Administrative Record was generated in response to this May 2002 request for information. (*See* A.R., filing 32, at 167 201.) I note

parenthetically that the defendants too have submitted evidence beyond that which is contained in the Administrative Record; (*see, e.g.,* filing 107, Ex. A; filing 108, ¶¶ 100–119); presumably, such evidence would be vulnerable to their own objection.

**2.** A copy of the "disbursement agreement" appears in the Administrative Record at page 167 203. A copy of the "reimbursement/subrogation forms" appears at pages 167 216–217.

counsel's signatures on the "subrogation contracts." (*Id.* at 205.)

The Plan responded to counsel's request in a letter dated June 11, 2002. (*See* A.R., filing 32, at 167 206.) This letter states, in part,

> The Plan language includes a Right to Reduction, Reimbursement and Subrogation provision, which clearly states 100% reimbursement is required with no reduction for attorneys' fees. This provision further states 100% reimbursement is required regardless of whether the participant was made whole or not as well as that the Plan has first priority from any judgment, payment or settlement. . . .
>
> Please refer to page 43 of the enclosed Summary Plan Description. There it states, "To aid the Plan in its enforcement of its right of reduction, recovery, reimbursement and subrogation, you and your representative must, at the Plan's request and at its direction: Take any action; give information; and execute documents so required by the Plan. Failure to aid the Plan and to comply with such requests may result in the Plan's withholding or recovering benefits, services, payments or credits due or paid under the Plan." . . .

(*Id.*)

Shortly thereafter, counsel submitted health insurance claim forms to the Plan. (*See* A.R., filing 32, at 167 10–17.) The Plan responded that the claim forms would be entered into its system, but added that "we will be happy to give further consideration to [Ms. Cossey's] accident-related claims, immediately upon receipt of the information we have previously requested from you." (*Id.* at 167 18.) On July 29, 2002, counsel wrote to the Plan and reiterated his refusal to sign, or to have Karla Cossey sign, the "additional subrogation contracts." (*Id.* at 167 211.) Counsel also requested documents from the Plan and asked that certain information be included in the administrative record. (*See id.* at 167 211–212.)

In a letter dated August 5, 2002, the Plan informed counsel that it had enclosed all documents that it was required to provide and that the other requested documents were already in the possession of Karla Cossey. (A.R., filing 32, at 167 214.) The plan also advised counsel that "all of Ms. Cossey's accident-related claims will be denied until you provide us with both the signed reimbursement agreement from Ms. Cossey and the signed disbursement agreement from yourself." (*Id.*) Finally, the Plan represented that "all internal and external correspondence as well as claims received, medical records, etc" would be "maintained within the claims system." (*Id.*)

On September 5, 2002, an appeals coordinator from the Wal–Mart Benefits Administration Appeals Department notified the Cosseys that the Committee denied their request that the Plan "pay Karla's medical claims without a signed Disbursement Agreement." (A.R., filing 32, at 167 225–226.) The plaintiffs' counsel replied on September 16, 2002, with an "appeal and . . . request that [the Appeals Department] review the denial of each of the claims. . . ." (*Id.* at 167 227.) In response to this letter, the appeals coordinator wrote, "according to the Plan I have no authority to overturn the Administrative Committee's decision of denial," and "[y]our only recourse is to pursue litigation." (*Id.* at 167 425.)

The Cosseys continued to submit medical bills and records to the Plan, but evidence suggests that many of these documents were not included in the administrative record. (*Compare* filing 95, ¶¶ 84, 150, 209–226 *with* filing 108, ¶¶ 84, 150, 209–226.) In any event, the Plan did not pay the bills submitted by the plain-

tiffs' counsel.[3] Counsel appealed these benefits denials, but on March 6, 2003, the Plan informed Karla Cossey that the Committee decided to deny her appeals. (*See* filing 94, Ex. 13 at 056–062; filing 107, Ex. A, Herbaugh Aff. ¶ 2.)

In April 2003, a settlement was reached in Karla Cossey's personal injury action. The amount and terms of this settlement have not been disclosed. On November 4, 2003, the Plan informed the plaintiffs that "Ms. Cossey's medical benefits are now subject to reduction since she has obtained a settlement from the third parties responsible for her injuries." (Filing 107, Ex. A–2 at page 3.) On November 7, 2003, Karla Cossey appealed this determination. (*See* filing 107, Ex. A–4.) I note parenthetically that while the appeal was pending, the Plan issued dozens of "Explanation of Benefits" forms concerning medical services provided to Ms Cossey between October 11, 2001, and September 29, 2003. (*See* filing 94, Ex. 14.) Many of these forms indicate that charges for these services would not be covered by the Plan because "[t]he covered person has recovered a settlement because of an accident," and "[t]he covered person's benefits are subject to the Plan's Right to Reduction and Judgement/Settlements provisions." (*E.g.*, filing 94, Ex. 14 at 002.) Ms. Cossey's appeal

was denied on March 12, 2004. (*See* filing 113, Ex. 1.)

The plaintiffs filed their sixth amended complaint on April 26, 2004. (*See* Sixth Am. Compl., filing 121.) The plaintiffs seek, *inter alia,*: 1) a declaratory judgment that the defendants violated their fiduciary duty to the plaintiffs; 2) a declaratory judgment that the defendants cannot require the plaintiffs (or any other covered person) or their counsel to sign "subrogation-reimbursement agreements" as a condition to the payment of benefits; 3) an order requiring the defendants to pay fines incurred as a result of their alleged failure to provide the plaintiffs' counsel with a copy of the administrative record and other documents; and 4) an order that the defendants pay, with interest, all medical expenses relating to Karla Cossey's automobile accident, including any fees, expenses, and increased charges caused by the defendants' refusal to provide benefits. (*See id.* at 15–17.) I note, however, that the sum of the medical expenses that Karla Cossey has accrued has not been established conclusively. There is evidence that as of August 15, 2003, the Plan received $75,512.10 in medical claims and had paid $598.27 in benefits. (*See* filing 93, Ex. 12 at 8.) However, there is also evidence that as of this same date, the Plan received

---

**3.** Parenthetically, I note too that the Administrative Record contains evidence that as of December 2002, the Plan refused to pay expenses associated with the birth of Karla Cossey's daughter in June 2001, which was approximately four months prior to Ms. Cossey's automobile accident. (*See* A.R., filing 32, at 167 785.) The parties agree that these expenses have now been paid; however, the parties dispute whether the Plan's prior refusal to pay these expenses was based upon counsel's and Ms. Cossey's refusal to sign the reimbursement / subrogation / disbursement forms associated with the automobile accident claims. I note that each party has submitted evidence outside of the Administrative Record in connection with this issue, (*see*

filing 95, ¶¶ 100–119; filing 108, ¶¶ 100–119), but I see no reason to take up this issue at this time.

In addition, the plaintiffs have submitted evidence (apart from the Administrative Record and over the defendants' objection) indicating that the Plan refused to pay a "pharmacy claim" submitted by Mr. Cossey, stating, "The Plan has the right to reduce benefits to satisfy the subrogation interest." (Filing 94, Ex. 13 at 013.) It appears that the plaintiffs appealed the Plan's decision, (*see id.* at 012), and that the appeal was denied, (*see id.* at 056–062). The defendants claim that their decision was authorized by the terms of the Plan. (*See* filing 106 at 33–34.)

$69,203.60 in claims and had paid $110.46 of that amount. (*See* filing 92, Ex. 8.)[4]

## II.  STANDARD OF REVIEW

### A.  Summary Judgment

A motion for summary judgment shall be granted by the court when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Id.* In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, 106 S.Ct. 2505 (citing Federal Rule of Civil Procedure 56(e)).[5]

"[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager v. Cormorant Township Board*, 716 F.2d 1211, 1214 (8th Cir.1983) (citations omitted). If the materials submitted by the parties support conflicting inferences with respect to any material fact, summary judgment is not appropriate. *See id.*

### B.  ERISA STANDARD OF REVIEW FOR SUITS BROUGHT PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

An ERISA plan participant or beneficiary may bring a civil suit "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The plaintiffs' amended complaint includes such a cause of action; therefore, I must determine the appropriate standard of review. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In that case, the

---

4.  These medical expense figures appear in the defendants' discovery responses and are not a part of the administrative record. Parenthetically, I note that the defendants do not object to the $75,512.10 figure, but do object to my consideration of the remaining figures on the ground that the evidence is "outside of the Administrative Record." (Filing 108, ¶¶ 162–63; *see also id.*, ¶ 161; filing 95, ¶¶ 161–63.)

5.  I note that courts have expressed doubts about the applicability of the familiar summary judgment procedures in ERISA cases. *See, e.g., Paulson v. The Paul Revere Life Insurance Co.*, 323 F.Supp.2d 919, 931 n. 3 (S.D.Iowa 2004). Nevertheless, I shall review the motions before me in light of Rule 56, while bearing in mind the unique considerations associated with the ERISA framework.

administrator's decision is ordinarily reviewed for an abuse of discretion. *Conley v. Pitney Bowes,* 176 F.3d 1044, 1048 (8th Cir.1999). However, a less-deferential standard of review may apply—even if the plan gives discretionary authority to the administrator—if the claimants "present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [the claimants]." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998).

In the instant case, I note that the Plan contains the following language:

> The Plan Administrator [ (i.e., the Committee) ] shall have complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, supply omissions, and determine the benefits payable under a Welfare Program.

(A.R., filing 32, at 167 173.)[6] This language clearly confers "discretionary authority to determine eligibility for benefits [and] to construe the terms of the plan," which suggests that the Committee's determinations are entitled to deference. *Bruch,* 489 U.S. at 115, 109 S.Ct. 948; *Conley,* 176 F.3d at 1048. However, the plaintiffs argue that conflicts of interest and serious procedural irregularities exist, and therefore the Committee's decisions are entitled to little or no deference.[7] (*See* filing 91 at 28–43.) I shall consider each of the plaintiffs' arguments in turn.

Preliminarily, I note that the plaintiffs have been allowed to conduct limited discovery for the purpose of assembling "material, probative evidence" to support a less-deferential standard of review, (*see* Order, filing 50), and I shall consider the evidence submitted by the plaintiffs even if it does not appear in the Administrative Record. *See Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 776 n. 4 (8th Cir.1998).

*1. Financial Conflict of Interest*

The plaintiffs argue first that because the members of the Committee hold financial stakes in Wal–Mart Stores, Inc., there exists a financial conflict of interest that warrants heightened scrutiny of the Committee's decisions. Although there is a potential for a conflict of interest when a plan is partially self-funded, *see Tillery v. Hoffman Enclosures, Inc.,* 280 F.3d 1192, 1198 (8th Cir.2002), "[n]ot every funding conflict of interest ... warrants heightened review, because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral," *id.* at 1197 (citations omitted).

The defendants' discovery responses establish that "Wal–Mart Stores, Inc. funds approximately two-thirds of the trust established for the [Plan]," and "[t]he remaining one-third of the trust funds are contributed by plan participants who elect coverage under the Plan." (Filing 92, Ex. 5 at 3.) Furthermore, there is evidence that the members of the Committee have finan-

---

**6.** There is no dispute that the "Wal–Mart Stores, Inc. Associates Health and Welfare Plan Wrap Document," (hereinafter "the Wrap Document"), is a formal Plan document. (*See* A.R., filing 32, at 161 167–180.) The quoted language appears in the Wrap Document.

**7.** The defendants argue that *de novo* review is never appropriate when the plan administra-

tor has been given the aforementioned discretionary authority. (*See* filing 106 at 34–37.) However, the Eighth Circuit has stated that under certain "egregious circumstances," an administrator's decision may be entitled to no deference even if the plan confers discretionary authority. *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1161–62 (8th Cir.1998) (citing *Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir.1997)).

cial stakes in Wal–Mart Stores, Inc. ranging from approximately .$50,000.00 to $1,080,000.00. (*See* filing 92, Ex. 11 at 2.) Although the defendants allege that these financial stakes represent a tiny fraction (specifically, 0.000015) of the "total outstanding shares for Wal–Mart Stores, Inc.," (filing 107, Ex. B), two of the members of the Committee testified that their "stakes" in Wal–Mart Stores, Inc., were "significant" or "important" parts of their personal wealth. (*See* filing 92, Ex. 1 at 44:1–45:8; *id.,* Ex. 3 at 10:22–11:4.) The plaintiffs reason that since Wal–Mart Stores, Inc. funds the Plan, and since the Committee's members have financial interests in Wal–Mart Stores, Inc., the Committee has an interest in limiting benefits payments in order to preserve Wal–Mart's Stores, Inc.'s assets. According to the plaintiffs, this interest conflicts with the Committee members' fiduciary duties, and the Committee's decisions are not entitled to deference.

■ I am not persuaded by the plaintiffs' argument. Though members of the Committee may be employees of Wal–Mart, Inc., such arrangements are specifically contemplated by ERISA. *See* 29 U.S.C. § 1108(c)(3); *Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 776 (8th Cir.1998). There is no evidence that any member of the Committee is given direct financial incentives to deny claims. *See Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir.1997).

While it is true that some, if not all, of the Committee members have significant financial interests in Wal–Mart Stores, Inc., any conflict created by these interests is mitigated by the fact that Wal–Mart Stores, Inc. provides only two-thirds of the funding for the Plan. At bottom, the plaintiffs' argument depends upon an assumption that the Committee members will act (and have acted) to maximize the value of their stakes in Wal–Mart Stores, Inc. by denying claims in order to preserve the trust fund. This argument is based on speculation, and therefore cannot justify heightened scrutiny of the Committee's decisions.[8] In short, the plaintiffs have not demonstrated that the Committee members' financial interests in Wal–Mart Stores, Inc. have created a "palpable conflict of interest" that "caused a serious breach of the plan administrator's fiduciary duty" to the plaintiffs. *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998).

### 2. *Procedural Irregularities*

The plaintiffs argue too that the defendants' determinations are entitled to little deference because procedural irregularities caused a serious breach of the Committee's fiduciary duty. *See Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998). According to the plaintiffs, these irregularities show that the Committee failed to use judgment in reaching its determination. *See, e.g., Buttram v. Central States, Southeast and Southwest Areas*

---

**8.** To illustrate, note that one might also speculate that the Committee members would be motivated to maximize the value of their interests in Wal–Mart Stores, Inc. by liberally granting appeals of benefits denials in order to attract and maintain a content, motivated workforce. *Cf. Farley,* 147 F.3d at 777 ("When considered in isolation, an insurer's desire to maintain competitive insurance rates could be construed as a conflict of interest. However, a benefits determination includes equally compelling long-term business concerns that would encourage insurers to make these determinations in a fair and consistent manner, thus negating any indicia of bias. In the long run, an insurer that routinely denies valid claims for benefits would have difficulty retaining current customers and attracting new business."). This theory seems no more or less plausible than that proposed by the plaintiffs, but, as it is based upon pure speculation, it does not aid my determination of the appropriate standard of review.

*Health and Welfare Fund,* 76 F.3d 896, 900 (8th Cir.1996). The plaintiffs can establish a failure of judgment by presenting evidence that leaves me with "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Id.* (citation omitted). "For example, where the plan trustee does not inquire into the relevant circumstances at issue; where the trustee never offers a written decision, so that the applicant and the court cannot properly review the basis for the decision; or where procedural irregularities are so egregious that the court has a total lack of faith in the integrity of the decision making process, a court may infer that the trustee did not exercise judgment when rendering the decision." *Id.* Here, the plaintiffs argue that the defendants' failure to use judgment is apparent for several different reasons, each of which will be discussed in turn.

■ First, the plaintiffs assert that the defendants failed "to act through administrative committee members who were aware that their duties as fiduciaries ran to the Plan participants and beneficiaries." (Filing 91 at 33.) The plaintiffs' argument is based upon the deposition testimony of a single member of the Committee:

Q. Do you know what "fiduciary" means in relation to the role of an administrative committee member?

A. Yes.

Q. What does it mean, according to your understanding?

A. We're the caretakers of the plan.

Q. Okay. Is that your total understanding of what your fiduciary responsibilities are?

A. No. That's not my total understanding, but—

Q. Well, what do you mean when you say it's your duty to be a caretaker of the plan?

A. Well, as an administrative committee member, I am a fiduciary of the plan, and I oversee the management of the plan. I can interpret plan provisions. And I also oversee the administration of the plan.

Q. And that is your understanding of your fiduciary duties?

A. Yes.

(Filing 92, Ex. 1 at 26:1–16.) The plaintiffs argue that because this member of the Committee did not volunteer that her fiduciary duty requires her to act "solely in the interests of the Participants and their beneficiaries," as stated in the Plan, (*see* A.R., filing 32, at 167 175), and ERISA, *see* 29 U.S.C. § 1104(a)(1), it follows that the defendants violated these requirements. I note, however, that the witness did not testify that she had no duty to act in the interests of the participants and beneficiaries of the Plan, and I see in her testimony no evidence of a procedural irregularity "so egregious" as to destroy all faith in the "integrity of the decision making process." *See Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 76 F.3d 896, 900 (8th Cir.1996).

■ Second, the plaintiffs argue that the defendants' failure to exercise judgment is demonstrated by the Committee's refusal to consider Karla Cossey's medical records. In response, the defendants argue persuasively that the medical records were not relevant to the decisions to deny benefits because the denials were based upon the plaintiffs' and their attorney's refusal to execute the subrogation, reimbursement, and disbursement agreements. (*See* filing 106 at 45–47.) I agree that the contents of the medical records are simply not among the "relevant circumstances at issue" with respect to the denials, *Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 76 F.3d 896, 900 (8th Cir.1996); *see also Woo v.*

*Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998) (stating that a claimant must establish that the procedural irregularity has "some connection to the substantive decision reached"); however, this is true only insofar as the denials were based upon the plaintiffs' and counsel's failure to sign the agreements. To the extent that the defendants seek to rely upon other bases for their decision to deny benefits, the contents of the medical records may well be directly relevant to their decision. For example, the record shows that after the settlement of Karla Cossey's personal injury action, the defendants reissued "Explanation of Benefits" forms that included new grounds for denying the plaintiffs' claims. It may be that the medical records are relevant to these new grounds, and thus the defendants' refusal to consider the records would suggest that the defendants did not use judgment in reaching their decisions. However, as the parties have not explored this issue in their briefs, I shall not attempt now to define the standard of review applicable to all possible "alternate bases" for the denials.

Third, the plaintiffs argue that one member of the Committee failed to exercise judgment because her "mind was closed from the beginning." (Filing 91 at 40.) This argument is based upon the Committee member's testimony that she voted to deny benefits because of the plaintiffs' refusal to execute the aforementioned subrogation, reimbursement, and disbursement agreements, and that no other evidence—including Karla Cossey's medical records—would have altered her vote. (*See id.* at 38–39 (citing, *inter alia,* filing 92, Ex. 1 at 18, 19–21, 22–25, 27–28).) However, as I have noted above, the Committee member's refusal to consider the medical evidence is consistent with the

reasoning behind her decision and does not indicate a lack of judgment. Also, the evidence shows that "from the beginning," the defendants have consistently and repeatedly warned the plaintiffs that their failure to return the agreements provided grounds for the denial of benefits. I do not agree with the plaintiffs' suggestion that the defendants' consistency is indicative of "closed-mindedness," or a lack of judgment. However, as I explained above, the testimony may indicate a lack of judgment insofar as the defendants attempt to introduce alternate bases for their decision to deny the plaintiffs' claims.

Fourth, the plaintiffs argue that their benefits denials were not determined by a majority of the Committee. (*See* filing 91 at 40.) The trust agreement that gave rise to the Plan [9] provides:

Any act which the Plans or Trust Agreement authorizes or requires the Administrative Committee to do may be done by a vote of the Committee, cast at a meeting at which a quorum is present or recorded in writing without a meeting. A quorum for the transaction of business at any meeting of the Administrative Committee shall consist of a majority of the members of the Committee then serving. Action at a meeting of the Committee at which a quorum is present shall be taken by a majority vote of those in attendance. The Administrative Committee may act in writing without a meeting provided such action has the written concurrence of a majority of the Administrative Committee then serving.

(A.R., filing 32, at 167 192.) The plaintiffs argue that, in violation of this provision, their claims were considered only by a subcommittee. (*See* filing 91 at 40 (citing filing 92, Ex. 2 at 13–14, 17).) They claim,

**9.** The Wrap Document, which is undeniably a formal Plan document, was created pursuant to the "Agreement and Declaration of Trust,

Associates Health and Welfare Trust," (hereinafter "the Trust Document"). (*See* A.R., filing 32, at 167 181–198.)

"[I]t is possible that a majority of a quorum of the full administrative committee would have granted the Cossey's appeals," and "[t]he chances of this might have increased had the members of the administrative committee actually met and discussed the Cosseys' case." (*Id.* at 40–41.) However, I note that the Trust Document states specifically that "[t]he Administrative Committee ... may ... provide for the allocation of fiduciary responsibilities ... among its members." (A.R., filing 32, at 167 193.) This provision is consistent with section 405(c) of ERISA. *See* 29 U.S.C. § 1105(c). Similarly, the Wrap Document authorizes the Committee to "appoint individuals or committees to assist in the administration of the Plan." (*Id.* at 167 173.) In light of these provisions, and in light of the speculative nature of the plaintiffs' suggestion that the benefits decision "might" have been affected had more Committee members reviewed it, I am not persuaded that there has been a procedural irregularity "so egregious" as to create a "total lack of faith in the integrity of the decision making process." *See Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 76 F.3d 896, 900 (8th Cir.1996). I note too that the plaintiffs did not refer me to evidence of the number of subcommittee members who reviewed their claims. It may well be that the subcommittee contained a quorum or majority of the Committee, which would nullify the plaintiffs' argument.

Finally, the plaintiffs argue that the Committee's decision is entitled to little deference because of its "failure to consider legal issues." (Filing 91 at 41.) Specifically, the plaintiffs assert that although the defendants' discovery responses indicate that "the Plan began requiring the attorneys of Plan members to sign disbursement agreements after, and in response to, the U.S. Supreme Court's decision in [*Great–West Life and Annuity Insurance Company v.] Knudson,* [534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002),]" the Plan's appeals coordinator and two members of the Committee "testified that they had never heard of *Knudson.*" (Filing 91 at 41–42.) According to the plaintiffs, the Committee members' lack of legal sophistication prevented them from considering the "legal implications of their actions," even after the plaintiffs' attorney submitted legal arguments in support of the plaintiffs' claims. (*Id.* at 43.) However, as the defendants note, the plaintiffs cite no authority in support of their argument that unfamiliarity with specific cases or legal arguments amounts to a failure of judgment, and there is no dispute that plan administrators and fiduciaries need not possess formal legal training. Therefore, I find that ignorance of the Supreme Court's decision in *Knudson* does not raise "serious doubts as to whether the [Committee's determination] was the product of an arbitrary decision or the plan administrator's whim," *Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 76 F.3d 896, 900 (8th Cir.1996), and heightened scrutiny of the Committee's decisions is not warranted merely because some of the Committee members lacked legal experience.

In sum, I conclude that the plaintiffs have not presented "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [them]." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998). Therefore, the defendants' decision to deny the plaintiffs' claims for benefits based upon the plaintiffs' failure to submit signed agreements will be reviewed for an abuse of discretion. *Conley v. Pitney Bowes,* 176 F.3d 1044, 1048 (8th Cir.1999).

"The abuse of discretion standard requires [me] to determine whether the plan administrator's decision was

reasonable; that is, whether a reasonable person could have reached the same decision." *Wald v. Southwestern Bell Customcare Medical Plan,* 83 F.3d 1002, 1007 (8th Cir.1996) (citing *Donaho v. FMC Corp.,* 74 F.3d 894, 899 (8th Cir.1996)). Five factors are relevant to this determination: "(1) whether [the plan administrator's] interpretation is consistent with the plan's goals; (2) whether the interpretation renders any of the plan's language meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (4) whether [the plan administrator] has interpreted the words at issue consistently; and (5) whether the interpretation is contrary to the plan's clear language." *Id.* (citing *Finley v. Special Agents Mutual Benefit Association, Inc.,* 957 F.2d 617, 621 (8th Cir. 1992)). The Eighth Circuit has stated that "additional evidence gathering is ruled out on deferential review," *Brown v. Seitz Foods, Inc. Disability Benefit Plan,* 140 F.3d 1198, 1200 (8th Cir. 1998); however, I note that in this case each party relies upon evidence that was not included in the Administrative Record. I shall attempt to confine my review to the Administrative Record, and any reference to "extrinsic" evidence will be identified.

### III. ANALYSIS

### A. Whether the Defendants' Decision to Deny Benefits Was Unreasonable

The defendants' original reason for denying benefits to the plaintiffs was the plaintiffs' refusal to execute a "Reimbursement–Subrogation Agreement" and counsel's refusal to execute a "Disbursement Agreement." The defendants rely upon the following language, which appears in the 2002 "Associate Benefits Book,"[10] in support of their decision:

Right to Reduction, Reimbursement and Subrogation

The Plan has the right to 1) reduce or deny benefits otherwise payable by the Plan and 2) recover or subrogate 100 percent of the benefits paid or to be paid by the Plan for covered persons to the extent of any and all of the following payments:

— Any judgment, settlement or payment made or to be made, because of an accident . . . including but not limited to other insurance.

— Any auto . . . insurance coverage or benefits including, but not limited to, uninsured/underinsured motorist coverage.

.        .        .        .        .

Cooperation Required

The Plan requires covered persons or their representatives to cooperate in order to guarantee reimbursement to the Plan from third party benefits. Failure to comply with this request will entitle the Plan to withhold benefits due to covered persons under the Plan Document. Covered persons or their representatives may not do anything to hinder reimbursement of overpayment to the Plan after you have accepted benefits.

.        .        .        .        .

---

10. In their briefs, the defendants quote the provision appearing in the 2001 "Associate Benefits Book." (*See* filing 19 at 6–8 (quoting *id.,* Ex. B–2); *see also* filing 107 at 3 (quoting filing 19, Ex. B–2 and filing 107, Ex. A–3).) The parties have not argued whether the provisions of the 2001 or 2002 book are controlling in this case, but since the relevant provisions are substantially equivalent, and since the 2001 book was not included in the Administrative Record, I have chosen to reproduce the terms that appear in the 2002 book.

NOTES:

- The Plan has the right to reduce or withhold future benefits payments for claims filed for covered persons.
- The Plan does not pay for charges for medical services, medical supplies or medical treatments to the extent of the amount of any judgment, settlement and/or payment which was previously made on behalf of you or any covered dependent.

- The right of reduction, reimbursement and subrogation is based on the Plan language in effect at the time of judgment, payment or settlement.

Participant's Responsibility Regarding Right of Reduction and/or Recovery

To aid the Plan in its enforcement of its right of reduction, recovery, reimbursement and subrogation, you and your representative must, at the Plan's request and at its discretion:

- Take any action;
- Give information; and
- Execute documents so required by the Plan.

Failure to aid the Plan and to comply with such requests may result in the Plan's withholding or recovering benefits, services, payments or credits due or paid under the Plan.

The Plan's right to reimbursement applies when the Plan pays medical benefits, and a judgment, payment or settlement is made on behalf of the covered person for which the medical benefits were paid. Reimbursement to the Plan of 100 percent of these charges shall be made at the time the payment is received by you, your attorney or other person on your behalf.

(A.R., filing 32, at 167 64–65.)

After Karla Cossey's personal injury action was settled, the defendants cited the settlement as an additional reason for denying benefits. In support of this decision, the defendants rely upon the foregoing language and an additional provision in the 2002 Associate Benefits Book, which states,

Charges Not Covered

Benefits shall not be payable for treatment or services for the following, even if it is standard medical treatment:

- Judgments / Settlements.

  Charges for any medical services, medical supplies or medical treatments to the extent of the amount of any judgment, settlement and/or payment which was previously made on behalf of you or any covered dependant.

(A.R., filing 32, at 167 54, 56.) This provision is virtually identical to language appearing among the "Notes" quoted above. (*Compare* A.R., filing 32, at 167 56 *with id.* at 167 64.) [11]

---

11. I have not specifically found that the defendants' decision to deny the plaintiffs' claims is entitled to deference insofar as the decision is based upon the Ms. Cossey's personal injury settlement. (*See supra* Part II.B.2 (indicating that the defendants' failure to consider the plaintiffs' medical records had no connection with the substantive decision to deny benefits only insofar as the decision was based on the plaintiffs' and counsel's refusal to return signed agreements).) In any event, in view of the findings set forth below it is clear that the defendants' reliance upon the "judgments and settlements" terms amounted to an abuse of discretion. Thus, it matters not whether the decision would have been affirmed under a less-deferential standard of review.

The Associate Benefits Book that contains the foregoing terms is a "Summary Plan Description," or SPD. (*See* A.R., filing 32, at 167 21, 23; filing 19, Ex. B–2); *see also* 29 U.S.C. § 1022.[12] There is no evidence that these terms appear in any other document or are consistent with the terms of any other document. In other words, the defendants' decisions to deny the plaintiffs' claims for benefits were based solely upon the terms of the SPD that are quoted above. The plaintiffs argue that these terms are invalid because the SPD is not part of the Plan and the language relied upon by the defendants was not added to the Plan in accordance with the Plan's amendment procedures. (*See* filing 91 at 43–44; filing 117 at 43–48; filing 113, ¶¶ 6, 20–21; and filing 134.) In response, the defendants assert that the portion of the SPD upon which they rely is, indeed, part of the actual "Plan." (*See* filing 106 at 51–55.) For the following reasons, I conclude that the plaintiffs are correct, and that the SPD terms quoted above are not valid Plan terms.

### 1. Whether the SPD Is Part of the Plan.

■ As I noted previously, there is no dispute that the Wrap Document, which was "amended and restated effective January 1, 2001," is a formal Plan document. (*See* A.R., filing 32, at 161 167–180.) I shall therefore consult the Wrap Document to determine whether it identifies the SPD as a formal Plan document.

According to the Wrap Document, the Plan comprises the Wrap Document itself "and each Welfare Program" that has been "incorporated [therein] by reference." (*See* A.R., filing 32, at 167 170.) The Wrap

Document defines the term "Welfare Program" as follows.

"Welfare Program" means a written arrangement that is offered by one or more Employers and incorporated in to the Plan by identification in Appendix A and which provides any employee benefit that would be treated as an "employee welfare benefit plan" under Section 3(1) of ERISA if offered separately. Welfare Program also means any plan established pursuant to Section 125 of the Code if incorporated herein by identification in Appendix A. For purposes of this Plan, only the terms of the formal plan document of each such arrangement is incorporated herein. Where no separate formal plan document exists, the plan document shall consist of any applicable insurance policy or contract and the applicable description of such benefits contained in the Associate Benefits Book [ (i.e., the SPD) ], as modified from time to time, to the extent consistent with any applicable insurance policy or contract.

(*Id.* at 167 170–71.) Citing this language, the defendants argue that the SPD has been incorporated into the Plan because it is identified in Appendix A of the Wrap Document. (*See* filing 106 at 54.) I disagree. Quite simply, the list of Welfare Programs does not include the SPD. (*Compare* A.R., filing 32, at 167 180 *with id.* at 167 21.) However, the foregoing language indicates that the SPD may nevertheless be a formal Plan document under certain circumstances. Specifically, portions of the SPD become part of the Plan if: 1) there is "no separate formal plan document" that provides the relevant benefits; 2) the relevant portions of the SPD describe the benefits set forth in "any applicable insurance policy or contract"; and 3) the relevant portions of the SPD are "consistent with" that policy or contract. (*Id.* at 167 171.)[13] As I shall explain, there is

---

12. The parties do not dispute that the Associate Benefits Book meets the applicable statutory and regulatory requirements for SPDs.

13. Parenthetically, I note that the terms of the

SPD itself are not inconsistent with this portion of the Wrap Document. The SPD states, Plan Documents

no evidence that these conditions have been met.

Turning first to the question of whether there is a "separate formal plan document" that provides the health benefits sought by the plaintiffs, I note that the list of Welfare Programs incorporated into the Plan includes the "Wal–Mart Associates' Group Health Plan." (A.R., filing 32, at 167 180.) Although the title of this plan suggests that it may be relevant, and although it is a formal Plan document by virtue of its designation as a Welfare Program in Appendix A of the Wrap Document, the Wal–Mart Associates' Group Health Plan has not been produced. Indeed, with the exception of the Trust Document, none of the eleven Welfare Programs listed in Appendix A of the Wrap Document is to be found in the record. At the same time, there is no evidence suggesting that these Welfare Programs do not exist. On the contrary, the record does suggest that the Welfare Programs existed as of January 1, 2001, when the Wrap Document was "restated," and the Welfare Programs were incorporated by reference therein. (*See* A.R., filing 32, at 167 167; *see also id.* at 167 180 (incorporating "Wal–Mart Associates' Group Health Plan" into the Plan).) In any event, since the Welfare Programs have not been produced, it is unclear whether there is a "separate formal plan document" that provides health benefits to the Plan participants.[14]

Even if I were to assume that there is no applicable "separate formal plan document," the portions of the SPD relied upon by the defendants would be incorporated into the Plan only to the extent that they describe, and are consistent with, the terms of "any applicable insurance policy or contract." (A.R., filing 32, at 167 171.) The defendants have not identified, submitted, or requested an opportunity to submit any such policy or contract; thus, there is no evidence that the relevant portions of the SPD accurately describe an "applicable insurance policy or contract." (*Id.*) Therefore, under the terms of the Plan as stated in the Wrap Document, the relevant portions of the SPD have not been incorporated into the Plan.

In sum, the defendants denied the plaintiffs' claims for benefits based upon language that appears solely in the SPD. However, pursuant to the formal Plan document, the terms of the SPD are incorporated into the Plan only if: 1) the SPD is a Welfare Program listed in Appendix A of the Wrap Document; or 2) there is no formal plan document that provides benefits *and* the relevant SPD terms are consistent with any applicable insurance policy or contract. There is no evidence that these conditions have been met. Therefore, the relevant portions of the SPD are not part of the Plan.

The defendants offer several arguments in support of their view that the relevant terms are part of the Plan. (*See* filing 106 at 51–55.) Although none of these arguments is persuasive, I shall discuss each of them in turn.

---

This benefits book is a summary of benefits offered. Additionally, portions of this book will serve as a part of the official plan document for the Associates' Health and Welfare Plan (the "Plan"). Should any questions ever arise about the nature and extent of your benefits, the formal language of the plan document, not the informal wording of this book, will govern. (A.R., filing 32, at 167 150.)

**14.** I note too that the SPD itself states, "This [medical] section describes the benefits available under the Associates' Medical Plan (Network Plan; Network $ Saver Plan)." (A.R., filing 32, at 167 42.) "The Associates' Medical Plan" has not been produced by the defendants, but it is not a Welfare Program listed in Appendix A of the Wrap Document.

First, the defendants refer me to the Affidavit of Terri Loftus, (*see* filing 106 at 51 (citing filing 107, ¶ 35 (citing filing 107, Ex. C, Loftus Aff. ¶ 3))), who is a "Benefits Manager" employed by Wal–Mart Stores, Inc. Loftus's affidavit is not part of the administrative record; nevertheless, I shall consider whether it is helpful in identifying the formal Plan documents. Loftus states,

> The terms of the Wal–Mart Stores, Inc. Associates' Health and Welfare Plan are set forth in the Wrap Document and the Summary Plan Description. The Plan is not limited to the Wrap Document only. Instead, the Summary Plan Description is part of the "Plan."

(Filing 107, Ex. C., Loftus Aff. ¶ 3.) Loftus's statement is evidence that Wal–Mart Stores, Inc.'s Benefits Manager *deems* the SPD to be a formal Plan document. It seems to me, however, that Loftus's statement does not establish that the Plan truly *consists of* the Wrap Document and the SPD. The latter issue is of primary interest, and Loftus's conclusory statement does not inform my analysis of it. *Cf. Miller v. Citizens Security Group, Inc.,* 116 F.3d 343, 346 (8th Cir.1997) ("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment." (citing *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1303–04 (8th Cir.1993))). In sum, I am not persuaded that the SPD is a formal Plan document merely because the defendants' benefits manager declares it to be so, particularly when her declaration contradicts the Plans' terms.

Second, the defendants argue that the SPD "is a summary of the Plan's provisions." (Filing 106 at 52 (citing filing 91 at 43–44).) While it is true that an SPD is meant to be a "plain language summary of the plan's terms," *Palmisano v. Allina Health Systems, Inc.,* 190 F.3d 881, 888 (8th Cir.1999) (citing 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.102–2), it does not follow that the relevant portions of the SPD in this case are part of the Plan. Furthermore, I point out that there is no evidence that the relevant portions of the SPD accurately summarize the terms of any formal Plan document. The related question of whether the SPD may properly add new terms to the Plan is discussed below. (*See infra* Part III.A.2.)

In connection with their second argument, the defendants also claim that neither the Trust Document nor the Wrap Document state that the Wrap Document is "the only Plan document." (Filing 106 at 52.) I have reviewed the Trust Document and the Wrap Document, (*see* A.R., filing 32, at 167 167–198), and I find that the defendants' claim is accurate insofar as it goes. Again, however, it does not follow that the relevant portion of the SPD must be part of the Plan.

Third, the defendants argue that the plaintiffs should not be allowed to "claim entitlement to the medical benefits described in the Summary Plan Description while repudiating the same document." (Filing 106 at 52.) The defendants' argument is based upon *Health Cost Controls of Illinois, Inc. v. Washington,* 187 F.3d 703 (7th Cir.1999), which is readily distinguishable from the instant case. In *Washington* the court stated,

> One loose end remains to be tied up, however. Although we have spoken of "the plan itself" and quoted language from the summary plan description referring to "the Plan," Washington denies that the plan, on which Health Cost necessarily predicates its claim for reimbursement, was ever placed in evidence. What we (and Health Cost) have called "the plan" is a document entitled "Subscriber's Service Agreement," which is in the record but which states that it (like the summary plan description) is

only a "summary" and that the "Group Service Agreement," which is not in the record, is the real plan document.

This kind of confusion is all too common in ERISA land; often the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as "the plan." *See, e.g., Milwaukee Area Joint Apprenticeship Training Comm. v. Howell,* 67 F.3d 1333, 1338 (7th Cir.1995); *Horn v. Berdon, Inc. Defined Benefit Pension Plan,* 938 F.2d 125 (9th Cir.1991) (per curiam). An uncontested affidavit in the record states that the Subscriber's Service Agreement, which is what Health Cost is treating as the plan, indeed provided the basis for administering the employee welfare plan. It is also uncontested that the "full benefits" that Washington received were determined in accordance with that document. Whether the Group Service Agreement even exists (it may have been issued by Michael Reese and lost in the shuffle when Humana acquired Reese), and whether if so it differs from the Subscriber's Service Agreement in any respect material to this case, we do not know. But having obtained benefits in accordance with the latter agreement, it ill behooves Washington to turn around and deny that the agreement is the authoritative plan document. It is not as if she were offering to reimburse Humana should it turn out that the Group Service Agreement entitles her to fewer benefits than the Subscriber's Service Agreement. Just as

the employee welfare plan would be estopped to set up "the plan itself" as a defense to a claim for benefits if Washington had reasonably relied on the language of the summary plan description, so she is estopped to repudiate the plan document on the basis of which she obtained her full benefits, which she wishes to retain.

*Washington,* 187 F.3d at 712. Unlike *Washington,* in the instant case the documents that are "the Plan" have been identified in the Wrap Document, and the SPD is not among them. Although the "ERISA land" confusion cited by the court in *Washington* is present in this case, the confusion here is of a different nature. As I noted above, the Wrap Document does not appear to contemplate an arrangement wherein the Wrap Document itself is the only formal Plan document, and I think it likely that formal Plan documents are missing from the record. The defendants would have me fill the gaps left by the missing formal documents by deeming the SPD a formal document.[15] To the extent that *Washington* favors this approach, I find it unpersuasive in this case. I see no reason to deem the SPD a formal Plan document, *in contravention of the Plan's terms,* merely because the defendants have not produced additional formal documents, or because the defendants chose to treat the SPD as if it were a formal Plan document.

*Washington* is distinguishable in other respects as well. For example, here there

---

**15.** The defendants also refer me to *LeHigh Valley Hospital v. Rallis,* Nos. CIV.A. 94–3082, CIV.A. 95–3511, 1996 WL 187560 (E.D.Pa. April 12, 1996), an unpublished opinion that was subsequently reversed, *see* 135 F.3d 765 (Table), in support of the proposition that a plan administrator's interpretation of a subrogation provision is reasonable even if *"the plan [is] silent* with respect to whether the plan could require a subrogation

agreement to be signed before paying medical benefits." (Filing 19 at 13 (emphasis added).) In *Rallis,* the court considered a subrogation provision *appearing in the plan* and concluded that the plan administrator reasonably interpreted this provision to allow it to condition benefits upon the claimant's signing of a subrogation agreement. *Rallis* is not helpful to the defendants' position, since here the relevant language does not appear in the Plan.

is no uncontested evidence that the SPD "provided the basis for administering the employee welfare plan." *Washington,* 187 F.3d at 712. On the contrary, the basis for administering the Plan is contained within the Wrap Document. (*See* A.R., filing 32, at 167 172–175.) Also, while it is arguable that the denials of the plaintiffs' benefits "were determined in accordance" with the SPD, *Washington,* 187 F.3d at 712, it does not follow that these determinations were consistent with the terms of the Plan. In essence, the defendants claim that under *Washington,* the plaintiffs are estopped from objecting to the "Right to Reduction, Reimbursement and Subrogation" provisions of the SPD because their claims for benefits can only proceed under the SPD. However, there is no evidence that the SPD is part of "the Plan," much less that the plaintiffs' claims can proceed only under the SPD.

Relatedly, and relying upon *Washington* once again, the defendants assert,

> If the Plan argued that it did not have to pay the benefits described in the Summary Plan Description because those benefits are not described in the Wrap Document, this Court would mock such an argument. The Plan could not set up "the Wrap Document" as a defense to not paying the benefits described in the Summary Plan Description by arguing that the Summary Plan Description is not part of the "Plan." Plaintiffs are pressing this unbelievable position.

(Filing 106 at 52.) The defendant's argument is not persuasive. Indeed, it is obvious that the plaintiffs are not pressing the "unbelievable" position that the defendants suggest. Instead, the plaintiffs have argued—and the record shows—that the Plan's own terms do not support the defendant's claim that the SPD is incorporated into the Plan. It is the defendants who have taken the position that they may use the SPD "as a defense to not paying the benefits," despite the fact that there is no evidence that the SPD contains an accurate summary—much less a formal statement—of the Plan's terms. It has not escaped my notice that the defendants' argument, not the plaintiffs', mirrors the position that the defendants themselves describe as "unbelievable."

It is true that under some circumstances, a defendant could be bound by inaccuracies in an SPD. *See, e.g., Palmisano v. Allina Health Systems, Inc.,* 190 F.3d 881, 887–88 (8th Cir.1999) (describing circumstances under which erroneous terms in SPDs are deemed controlling). For example, in view of the fact that "employee benefit plans are usually lengthy and highly technical documents," and given ERISA's goal of providing "[a]dequate disclosure to employees," *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994), it has been held often that the terms of the SPD prevail in the event of a conflict between the SPD and the formal plan documents, *see id.; Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 621 (8th Cir.1998); *Barker v. Ceridian Corp.,* 122 F.3d 628, 633 (8th Cir.1997). However, the defendants have not persuaded me that a rule that serves to protect claimants against "obscure passage[ ]s in ... transactional document[s] only lawyers will read and understand," *Marolt,* 146 F.3d at 621, ought to serve the interest of the defendants in this instance. *See Schultz v. Stoner,* 308 F.Supp.2d 289, 307 (S.D.N.Y. 2004) ("In cases of conflict between the terms of an SPD and the Plan itself, we have found that the SPD controls.... It is not clear, however, that this principle applies where, as here, the SPD is being used as a sword rather than a shield." (Quoting *Camarda v. Pan American World Airways, Inc.,* 162 F.3d 1147, 1998 WL 639300 (2nd Cir.1998))); *Paulson v. The Paul Revere Life Insurance Co.,* 323 F.Supp.2d 919, 938–40 (S.D.Iowa 2004); *cf.*

*Grosz–Salomon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154, 1162 (9th Cir. 2001) ("[T]o say that an employee may hold an employer to its own representations is a far cry from saying that an insurer may unilaterally amend a plan summary with an insured in a manner that does not comport with the underlying contract's provision for changes and then, when the insured fails to detect the change, exploit the oversight to the detriment of the insured's employees.").

Fourth, the defendants argue that "the Wrap Document and the [Trust Document] state that the Summary Plan Description is part of the 'Plan.' " (Filing 106 at 53.)[16] The Trust Document states, "The Administrative Committee shall prepare and cause to be delivered to each Associate who is covered by one or more of the Plan [sic] booklets describing the Plans by which the Associate is covered." (A.R., filing 32, at 167 188.) The defendants claim that since the SPD is the "booklet describing the Plan" referred to in the Trust Document, the SPD must be a formal Plan document. The defendants' reasoning simply does not bear up against close scrutiny. Indeed, the quoted language suggests that the plaintiffs are covered by some other formal statement of the Plan, and that the SPD merely describes that Plan. It does not follow that the SPD is a formal Plan document.

The defendants' fifth argument is an echo of their fourth. The defendants argue that the SPD must be a part of the Plan because "the [Trust Document] defines the 'Health and Welfare Plans' as 'the programs formulated and adopted to carry out the purposes of the Trust [Document],' " and "[t]he Summary Plan Description describes the benefits under the programs formulated to carry out the purposes of the Trust [Document], i.e., to provide medical benefits to the plan participants." (Filing 106 at 54 (citations omitted).) More succinctly, the defendants argue that the SPD is part of the Plan because it describes the programs that are a part of the Plan and there is no other detailed description of the Plan's terms in the record. Again, the defendants' reasoning is not persuasive. Preliminarily, I note that although the SPD ought to be an accurate description of the Plan, there is no evidence that this is true. That aside, the defendants' characterization of the SPD as a "Health and Welfare Plan" is not consistent with the terms of the Wrap Document, (*see* A.R., filing 32, at 167 170–71 (defining Welfare Program)), the Trust Document, (*see id.* at 167 188 ("The Trustee shall adopt a formal statement of the Health and Welfare Plans in their entirety. . . . The Administrative Committee shall prepare and cause to be delivered to each Associate who is covered by one or more of the Plan[s] booklets describing the Plans by which the Associate is covered.")), or the SPD itself, (*see id.* at 167 150 ("Should any questions ever arise

---

16. The defendants present no argument that the "Wrap Document . . . state[s] that the Summary Plan Description is part of the plan." (Filing 106 at 53.) Instead, they suggest that because the "Wrap Document *does not state* which medical services are covered under the Plan and which are not," (*id.* (emphasis added)), and because the SPD does so, the SPD must be part of the Plan. It is certainly true that the Wrap Document does not state "which medical services are covered." Instead, as I noted above, this information is

meant to be found in the Welfare Programs that are incorporated into the Wrap Document by virtue of their listing in Appendix A. Once again, the defendants' argument that the SPD is a formal Plan document relies upon the fact that they have provided no other detailed, formal description of the Plan's terms. I do not know whether the defendants continue to maintain all of the formal Plan documents, but it is apparent that *their position is not consistent with the terms* of the Wrap Document.

about the nature and extent of your benefits, the formal language of the plan document, not the informal wording of this book, will govern.")).

Sixth, the defendants argue that the SPD is a Welfare Program identified in Appendix A of the Wrap Document. (*See* filing 106 at 54.) As I noted above, this argument is not consistent with the record.

Finally, the defendants claim that I should conclude that the SPD is a part of the Plan because other courts have already done so. (*See* filing 106 at 54–55 (citing *Wal–Mart Stores Associates' Health and Welfare Plan v. Bond,* No. Civ. A. 96–7522, 1997 WL 330388 (E.D.Pa. June 5, 1997); *Walker v. Wal–Mart Stores, Inc.,* 159 F.3d 938, 940 (5th Cir.1998)).) However, neither of the cases cited by the defendants includes an analysis of the question of whether the SPD is a part of the Plan. In short, I find them to be unpersuasive.

In sum, the defendants denied the plaintiffs' claims for benefits based upon language that appears solely in the SPD because they considered the SPD to be a formal statement of the Plan's terms. Pursuant to the Plan's own terms, the terms of the SPD are incorporated into the Plan only if: 1) the SPD has been identified in Appendix A in the Wrap Document; or 2) there is no formal plan document that provides health benefits *and* the relevant SPD terms are consistent with any applicable insurance policy or contract. There is no evidence that these conditions have been met. Therefore, the relevant portions of the SPD are not part of the Plan.

### 2. *Whether the SPD Amends the Plan.*

▮▮▮ Although the foregoing analysis demonstrates that the SPD is not a formal Plan document, I have considered whether the SPD amounts to a valid amendment to the Plan, such that the relevant portions of the SPD are valid and enforceable against the plaintiffs. The

Ninth Circuit has observed that "a provision in [a] summary plan description can establish a new plan term if it meets all the statutory, regulatory, and plan requirements for modifying the plan." *White v. Jacobs Engineering Group Long Term Disability Benefit Plan,* 896 F.2d 344, 348 (9th Cir.1989). The plaintiffs argue persuasively that there is no evidence that the relevant portion of the SPD meets the Plan requirements for modifying the Plan. (*See* filing 117 at 44–45.) The Wrap Document contains the following provision:

> The Plan is subject to amendment at any time without consent of the Participants. The procedure for amending the Plan, including the addition or deletion of a Welfare Program from Appendix A, shall consist of the Administrative Committee or its delegate submitting proposed Plan amendments to the Executive Committee of the Board of Directors of the Company, receiving its approval, then communicating the amendments along with the effective date of such amendments to Participants. The purchase of an insurance policy, by either the Company or Plan Administrator, to provide Plan benefits, even though constituting part of the formal plan document, may be done without compliance with the amendment procedure of this Section . . . if the benefit is properly listed on Appendix A as a Welfare Program. Similarly, an insurance policy providing Plan benefits may be modified by the policy (the Plan Administrator on behalf of the Plan or the Company, as the case may be) without compliance with the amendment procedure of this Section. . . .

(A.R., filing 32, at 167 177–78.) There is no evidence that the relevant portions of the SPD were added to the plan pursuant to the foregoing amendment procedure, nor is there any indication that an exception to the amendment procedure is appli-

cable. As a result, the terms of the SPD upon which the defendants rely are not valid additions to the Plan. *Cf. Grosz–Salomon v. Paul Revere Life Insurance Co.,* 237 F.3d 1154, 1161–62 (9th Cir.2001) (holding that SPD provision granting discretionary authority to the plan administrator is invalid because the term was not part of the policy and did not amend the policy in conformance with the policy's amendment provisions); *Shaw v. Connecticut General Life Insurance Co.,* 353 F.3d 1276, 1282–84 (11th Cir.2003) (same); *Ludlow v. Advo–Systems, Inc. Disability Income Plan,* No. 03–4964 MMC, 2004 WL 1844843 at *3–4 (N.D.Cal. Aug. 18, 2004) (holding that SPD provision requiring claimant to present her administrative appeal within 60 days of the claim denial was invalid); *Schultz v. Stoner,* 308 F.Supp.2d 289, 307 (S.D.N.Y.2004) ("[T]o hold categorically that an SPD which may well narrow the plans' original participation provisions supersedes the official plan text to the extent there is a conflict would be to permit plan sponsors and fiduciaries to escape obligations undertaken in duly adopted plans by the simple expedient of disseminating more restrictive SPDs. Such a result would be entirely inconsistent with ERISA's requirements that SPDs be accurate and that plans be administered in accordance with their terms, including compliance with amendment procedures.")

### 3. Conclusion.

The defendants' decision to deny benefits was based initially upon the plaintiffs' refusal to execute a "Reimbursement–Subrogation Agreement" and counsel's refusal to execute a Disbursement Agreement; later, the defendants retroactively denied benefits for the additional reason that Karla Cossey obtained a settlement in her personal injury action. Each of these decisions was based upon terms that appear only in the SPD, and the Administrative Record demonstrates that the defendants treated the SPD as a source of formal Plan terms. (*See, e.g.,* A.R., filing 32, at 167 206; *see also* filing 107, Ex. C., Loftus Aff. ¶ 3 (not part of the Administrative Record).) However, the defendants' decision to treat the SPD as a formal Plan document was "contrary to the plan's clear language," and rendered "the plan's language meaningless or internally inconsistent." *Wald v. Southwestern Bell Customcare Medical Plan,* 83 F.3d 1002, 1007 (8th Cir.1996). Similarly, to the extent that the defendant believed that the relevant portions of the SPD amended the Plan, their belief contradicted the Plan's language and rendered the amendment procedures meaningless. In either event, after studying the formal Plan documents, no reasonable person could reach the same decision as did the defendants. The document upon which the defendants relied in denying the plaintiffs' benefits was not a part of the Plan, and the Plan had not been amended to include the language appearing in that document. There is no evidence that the denials of the plaintiffs' claims were made in accordance with the Plan's terms or were based upon a reasonable interpretation of the Plan's terms. Therefore, I conclude that the defendants' decision to deny benefits to the plaintiffs was arbitrary and capricious and amounted to an abuse of discretion.

The remedy that ought to be afforded to the plaintiffs remains to be determined. The plaintiffs argue that I "should order the Plan to pay all medical bills incurred by the Cosseys," (*See* filing 91 at 52.) However, the plaintiffs acknowledge that the amount owed by the defendants is uncertain. (*See, e.g.,* filing 117 at 6.) Moreover, even if the amount owed had been established with certainty, it does not necessarily follow that the order sought by the plaintiffs is the appropriate remedy. Instead, it may be appropriate to order a remand for reevaluation of the merits of

the plaintiffs claims. *See, e.g., Abram v. Cargill, Inc.,* 395 F.3d 882 (8th Cir.2005) (citing *Harden v. American Express Financial Corp.,* 384 F.3d 498, 500 (8th Cir. 2004) (per curiam); *Gaither v. Aetna Life Insurance Co.,* 388 F.3d 759, 773–76 (10th Cir.2004); *Gallo v. Amoco Corp.,* 102 F.3d 918, 923 (7th Cir.1996)); *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1163 (9th Cir.2001); *Quinn v. Blue Cross & Blue Shield Association,* 161 F.3d 472, 476–77 (7th Cir.1998). The plaintiffs resist this notion, arguing that the defendants should not be given a second opportunity to review the benefits decisions and devise new reasons for denying them. (*See* filing 91 at 25, 52.) The plaintiffs may well be correct; however, the authorities cited by the plaintiffs in support of this argument are not on all fours with the present case. (*See id.* (citing *Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 620 (8th Cir.1998) (holding that employer's failure to provide a rationale for its decision was contrary to ERISA); *Richardson v. Central States, Southeast and Southwest Areas Pension Fund,* 645 F.2d 660 (8th Cir.1981) (holding that employer was required to set forth the rationale supporting its benefits decision)).) In view of the fact that the amount of the award sought by the plaintiffs has not been established with particularity, and in view of the fact that the plaintiffs have not demonstrated that, as a matter of law, they are entitled to an order awarding benefits (as opposed to an order remanding the matter to the Committee for further review), I find that the appropriate remedy remains to be determined.

## B. Whether the Defendants Breached Their Fiduciary Duty to the Plaintiffs

Citing 29 U.S.C. §§ 1132(a)(2) and (3), the plaintiffs seek equitable relief stemming from the defendants' alleged violations of their fiduciary duty. (*See* Sixth Am. Compl., filing 121, ¶¶ 80–84.) I shall analyze in turn the plaintiffs' claims under each subsection of the statute.

Preliminarily, however, I shall address two arguments raised by the defendants in support of their motion for summary judgment on the plaintiffs' fiduciary duty claims. First, the defendants submit that the plaintiffs' fiduciary duty claims "fail[ ] as a matter of law because ERISA, 29 U.S.C. § 1132(a)(1)(B), provides them with an avenue to seek relief." (Filing 106 at 19 (citations omitted).) I have rejected this argument previously, and it need not be revisited here. (*See* Mem. and Order on Defs.' Partial Mot. to Dismiss, filing 111.)

Second, the defendants argue that the plaintiffs' fiduciary duty claims fail because the Committee's decision to deny benefits was not arbitrary and capricious. (*See* filing 106 at 20; *see also id.* at 25–26.) As I explained in the preceding section of this memorandum, the defendants' decision to deny benefits was, in fact, arbitrary and capricious. (*See supra* Part III.A.) Therefore, the defendants' argument is not availing.[17]

---

**17.** The defendant's argument that their decision to deny benefits was not arbitrary and capricious is based upon their assertion that courts have allowed plan fiduciaries to withhold benefits until "signed [a]greements" are received. (Filing 106 at 20 (citing *Bird v. NECA–IBEW Local 176 Health and Welfare Plan of Benefits,* No. 03 C 3935, 2003 WL 23415990 (N.D.Ill. Dec. 18, 2003); *Kress v. Food Employers Labor Relations Assoc.,* 285 F.Supp.2d 678 (D.Md.2003), *aff'd,* 391 F.3d 563 (4th Cir.2004)).) However, this assertion is moot in light of my finding that the Plan terms did not authorize the conditioning of benefits upon the receipt of the agreements. (*See supra* Part III.A.) In other words, in this case I need not determine whether the terms upon which the defendants relied *would* have been enforceable *if* they had been included properly in the Plan.

*1. Section 1132(a)(2)*

The plaintiffs claim that "Plan-wide declaratory and injunctive relief" ought to be ordered pursuant to 29 U.S.C. § 1132(a)(2). (Filing 91 at 54.) This section provides that a civil action may be brought "by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109 states, in relevant part,

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

■ The plaintiffs argue that the Committee has breached its fiduciary duty "by failing to act 'solely in the interest of the participants and beneficiaries,' failing to act with 'care, skill, prudence, and diligence,' and failing to act 'in accordance with the documents and instruments governing the plan.' " (Filing 91 at 50 (quoting 29 U.S.C. 1104(a)(1)).[18]) In view of the analysis set forth in the preceding section of this memorandum, it is clear that the defendants did not act "in accordance with the documents and instruments governing the plan," 29 U.S.C. § 1104(a)(1)(D), when they relied upon the invalid reimbursement, reduction, disbursement, subrogation and settlement provisions of the SPD to deny the plaintiffs' claims for benefits. (*See supra* Part III.A.) However, in order to be entitled to summary judgment, the plaintiff must also demonstrate that the Committee's failure to act in accordance with the Plan amounted to a failure to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see also Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–18 (8th Cir.1994); *Schultz v. Stoner,* 308 F.Supp.2d 289, 303 (S.D.N.Y.2004); *Borneman v. Principal Life Insurance Co.,* 291 F.Supp.2d 935, 945–46 (S.D.Iowa 2003).

> The prudent person standard mandated by § 1104(a) is an objective standard that focuses on the fiduciary's conduct preceding a challenged decision. *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–918 (8th Cir.1994) (citations omitted). To say a decision is objectively reasonable "require[s] taking into account everything that the trustees *should have known* at the time of their decision." *Id.* at 919 (emphasis in original) (citations omitted). As a fiduciary, [the defendant] has a duty to act in the best interests of all plan participants and beneficiaries, not simply a duty to act in the best interests of each individual plan participant or beneficiary.

*Borneman,* 291 F.Supp.2d at 945–46. Here, the plaintiffs merely allege that the Committee failed "to act with 'care, skill, prudence, and diligence.' " (Filing 91 at 50.) They have provided no relevant argument, authority, or citations to the record in support of this allegation, and their reference to the applicable standard of proof is, at best, incomplete. I am not persuaded that the plaintiffs' bare assertion is sufficient to carry their summary

---

**18.** This section is part of the subchapter referred to in § 1109(a).

judgment burden, and I am not obliged to comb the record to identify the arguments or facts that the plaintiffs might have presented in support of their position. Thus, it remains to be determined at trial whether the Committee breached its fiduciary duty.

The parties also dispute the scope of the remedy available to the plaintiffs under 29 U.S.C. § 1132(a)(2), if the plaintiffs should establish that the Committee breached its fiduciary duty. In the interests of efficiency, I shall comment upon this dispute. The plaintiffs seek an order:

(1) declaring that the practice of the Plan and the administrative committee of requiring Plan participants to sign reimbursement-subrogation agreements as a condition to the payment of benefits violates the Plan's terms and breaches the responsibilities, obligations, and duties imposed upon the administrative committee as the Plan fiduciary; (2) declaring that the practice of the Plan and the administrative committee of requiring attorneys for Plan participants to sign disbursement agreements as a condition to the payment of benefits violates the Plan's terms and breaches the responsibilities, obligations, and duties imposed upon the administrative committee as the Plan fiduciary; (3) enjoining the Plan and the administrative committee from requiring Plan participants to sign reimbursement-subrogation agreements as a condition to the payment of benefits; and (4) enjoining the Plan and the administrative committee from requiring attorneys for Plan participants

to sign disbursement agreements as a condition to the payment of benefits. (Filing 91 at 55–56.)[19] According to the defendants, the plaintiffs claim must be dismissed because claims under § 1132(a)(2) are "limited to situations where the relief inures to the benefit of the plan as a whole and 'is not focused on the rights of individual beneficiaries.'" (Filing 106 at 25 (quoting *Keir v. UnumProvident Corp.,* No. 02 Civ. 8781, 2003 WL 2004422 (S.D.N.Y. April 29, 2003)).) In response, the plaintiffs argue that the relief they seek is meant to confer "plan-wide" benefits, and is therefore consistent with *Keir.* (*See* filing 117 at 31–32.)[20] It seems to me that the order sought by the plaintiffs does not merely provide "relief addressed to the resolution of [the plaintiffs'] individual claims for benefits." *Keir,* 2003 WL 2004422 at *3. Therefore, I reject the defendants' argument that the relief sought by the plaintiffs cannot be afforded under § 1132(a)(2).

However, as the defendants' correctly note, (*see* filing 106 at 26), the relief sought by the plaintiffs is too broad. It is true that the Plan's demand that the Cosseys provide the signed agreements as a condition to the payment of benefits was unreasonable. However, even if I assume that this finding is sufficient to establish a fiduciary breach, the finding is based upon the invalidity of the terms appearing in the 2001 or 2002 SPD, which in turn depends upon the Plan language in effect at the relevant times. The Plan language in effect at the present time is unknown. As a result, I am not persuaded that it would be appropriate to declare that the Plan's prac-

**19.** The plaintiffs argue that this relief may be ordered pursuant to 29 U.S.C. § 1132(a)(2) or (3). (*See* filing 91 at 55.) My analysis of the plaintiffs' claims under § 1132(a)(3) is set forth separately below.

**20.** I note parenthetically that *Keir* involved a claim brought pursuant to 29 U.S.C.

§ 1132(a)(3), as opposed to 29 U.S.C. § 1132(a)(2). *Keir v. UnumProvident Corp.,* No. 02 Civ. 8781, 2003 WL 2004422 at *1 (S.D.N.Y. April 29, 2003). Nevertheless, the relevant portion of the opinion concerned the plaintiffs standing to seek relief under 29 U.S.C. § 1109, *see id.* at *3, and is therefore apposite.

tice, if indeed it continues under the current terms of the Plan, is presently arbitrary and capricious or amounts to a breach of fiduciary duty. Similarly, the injunctions sought by the plaintiffs would affect the present administration of the Plan, and it is not apparent that the current Plan documents match (in all relevant respects) the documents that I have analyzed in this case. In sum, if the plaintiffs do ultimately prevail on their fiduciary duty claims, the "Plan-wide" declaratory and injunctive relief sought by the plaintiffs must be limited to the appropriate scope. Furthermore, I note that the "Plan-wide" relief requested by the plaintiffs must be so limited whether it is awarded under § 1132(a)(2) or (3).

### 2. Section 1132(a)(3)

■■■ It is well-established that pursuant to 29 U.S.C. § 1132(a)(3), a beneficiary may obtain equitable relief when a plan administrator breaches the fiduciary duties set forth in 29 U.S.C. § 1104(a). *See Howe v. Varity Corp.*, 36 F.3d 746, 748, 755 (8th Cir.1994), *aff'd*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). That section states, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purposes of ... providing benefits to participants and their beneficiaries ... and ... defraying reasonable expenses of administering the plan; ... [and] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man ... would use ...; [and] in accordance with the documents and instruments governing the plan...." 29 U.S.C. § 1104(a)(1). (*See also* A.R., filing 32, at 167 175.) The plaintiffs argue that the Committee has breached its fiduciary duty

"by failing to act 'solely in the interest of the participants and beneficiaries,' failing to act with 'care, skill, prudence, and diligence,' and failing to act 'in accordance with the documents and instruments governing the plan.'" (Filing 91 at 50.) However, for the reasons stated above, the plaintiffs have not demonstrated that they are entitled to judgment as a matter of law, and their claim remains to be resolved at trial. (*See supra* Part III.B.1.)

Once again, the parties disagree as to the remedies available if the Committee has, in fact, breached its fiduciary duty. The plaintiffs ask that I "order the Plan to not deny any future claims of the Cosseys based on the refusal of Mrs. Cossey to sign the reimbursement-subrogation agreement or of her counsel to sign the disbursement agreement or otherwise based on the Plan's claimed right of subrogation or reimbursement." (Filing 91 at 53–54.) In addition, they state that I "should order the Plan to pay all late fees, penalties, collection service fees, interest, attorney fees, lost discounts and other indebtedness or losses incurred by the Cosseys due to the Plan's refusal to timely pay the Cosseys' benefits," and "should also order the Plan to reimburse the Cosseys, with interest, for medical bills, penalties or other amounts the Cosseys have paid due to the Plan's refusal to timely pay the Cosseys' benefits." (*Id.* at 54.) The plaintiffs' request has a number of shortcomings. First, it is not clear that the Plan should be ordered to pay "any future claims of the Cosseys." It seems that the plaintiffs' request may be framed too broadly.

Second, the parties have done little to identify which of the remedies requested by the plaintiffs are "equitable," as opposed to "compensatory."[21] I have al-

---

**21.** The defendants offer a general argument that all of the remedies sought by the plaintiffs are "compensatory, not restitutionary," (*see* filing 106 at 23 (citing *Great–West Life &*

*Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002))), though they subsequently (and correctly) ex-

ready determined that the plaintiffs may recover "all equitable relief . . . allowed by law." (Mem. and Order of Def.'s Partial Mot. to Dismiss, filing 111 (quoting Fifth Am. Compl., filing 59, at 16).) *See also Calhoon v. Trans World Airlines, Inc.*, 400 F.3d 593, 596–97 (8th Cir.2005) (defining factors used to determine whether relief is legal or equitable and rejecting "make whole" remedial scheme). It remains to be determined at trial which of the many types of remedies sought by the plaintiffs are, indeed, equitable in nature.

Finally, I note that it is well-established that the plaintiffs will not be permitted to recover the same relief under 29 U.S.C. § 1132(a)(1)(B), which allows them to recover benefits due, and under § 1132(a)(3), which allows them to recover equitable restitution. *See, e.g., Geissal v. Moore Medical Corp.*, 338 F.3d 926, 933 (8th Cir. 2003). The fact that the relief due under § 1132(a)(1)(B) is presently unknown, (*see supra* Part III.A.3), renders it impractical for me to attempt to identify now the types of relief that may be due under § 1132(a)(3).

## C. Whether the Defendants Must Pay Statutory Penalties

The plaintiffs allege that they are entitled to recover a "statutory penalty" due to the defendants' delay in providing a copy of the Administrative Record and a "network directory." (*See generally* filing 79; *see also* Sixth Am. Complaint, filing 121,

¶¶ 32–36.) I shall consider first the plaintiffs' claim insofar as it relates to the Administrative Record.

It is undisputed that on September 20, 2002, the plaintiffs requested a copy of the Administrative Record from the defendants. (*See, e.g.*, A.R., filing 32, at 167 305.) There is evidence that ordinarily copies of the Administrative Record were provided to Plan participants upon request, (*see* filing 79, Ex. 2, Souders Dep. at 39:19–24); indeed, one member of the Committee testified that participants had a "right to the Administrative Record," (*id.*, Ex. 1, Howard Dep. at 6:15, 39:4–6). However, the defendants did not provide a copy of the Administrative Record to the plaintiffs until early 2003. (*See* filing 32; *see also* filing 68, ¶ 9.) [22]

■■■ The plaintiffs argue that the defendants' delay in providing a copy of the Administrative Record violates 29 C.F.R. § 2560.503–1(h)(2)(iii), which states:

(h) Appeal of adverse benefit determinations.

.     .     .     .     .

(2) Full and fair review. Except as provided in paragraphs (h)(3) and (h)(4) of this section, the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and

---

empt interest from their argument, (*see* filing 128 at 24 n. 2 (citing *Parke v. First Reliance Standard Life Insurance Co.*, 368 F.3d 999, 1006–09 (8th Cir.2004))). The authorities cited by the plaintiffs concern only prejudgment interest and attorney's fees. (*See* filing 91 at 54 (citing *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir.1981) (discussing prejudgment interest and attorney's fees at pages 1218–20); Francis M. Dougherty, Annotation, *What Constitutes "Other Appropriate Equitable Relief," Under §§ 502(a)(3)(B), 502(a)(5)(B) of Employee Retirement Income Security Act (29 U.S.C.A. §§ 1132(a)(3)(B), 1132(a)(5)(B)),*

*Which May Be Obtained to Address Violations, or to Enforce Provisions, of Act*, 98 A.L.R. Fed. 705, § 7 (discussing interest)).)

**22.** The defendants state that they provided a copy of the *second* Administrative Record on March 17, 2003. (*See* filing 68, ¶ 9.) They claim that the "initial" copy of the Administrative Record was made available on February 12, 2003, when the defendants filed their memorandum in support of their motion to affirm the Committee's decision. (*See* filing 19; *see also* filing 68 at 3 n. 2.)

adverse benefit determination unless the claims procedures—

.    .    .    .    .

(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section[.]

However, as the defendants' correctly note, this regulation does not appear to apply to the plaintiffs' claims-except insofar as the plaintiffs submitted claims after January 1, 2003. *See* 29 C.F.R. § 2560.503–1(*o*)(2) ("This section shall apply to claims filed under a group health plan on or after the first day of the first plan year beginning on or after July 1, 2002, but in no event later than January 1, 2003."); (A.R., filing 32, at 167 152 ("The Plan's fiscal year ends December 31.")). In any event, even if this regulation were applicable in this case, the plaintiffs have not shown that a penalty is to be awarded in the event of its breach. I therefore find that the defendants are entitled to summary judgment on the plaintiffs' statutory penalty claim insofar as the claim is based upon the defendants' failure to provide a copy of the Administrative Record in good time.

The "network directory" is a list of medical providers that participate in the Plan. (*See* filing 68, Ex. A.) On July 29, 2002, the Cossey's attorney wrote to Jeannette Wike–Taglauer, a "Reimbursement Specialist" for the Plan, stating, "Your Summary Plan Description states, at page 22, that a network directory of hospitals and doctors is available upon request. This is my request for a network directory." (A.R., filing 32, at 167 19–20.) In fact, the SPD states, at page 22:

Network Directories

Directories listing network hospitals and doctors are available at all locations (except Hawaii) free of charge. See your Personnel Representative for more information.

(A.R., filing 32, at 167 44.) On August 5, 2002, Wike–Taglauer replied to counsel's request, stating,

As for your request for information, I am enclosing all documents that I am required by law to provide to you.... A network directory is provided to all plan participants at the beginning of each plan year. Please obtain that information from Ms. Cossey.

(*Id.* at 167 199.) Mr. Cossey states, "The only time that I recall obtaining a directory of network hospitals and physicians from Wal–Mart was when I first enrolled in the health plan, in or around 1997." (Filing 117, Ex. 4, ¶ 10.) He speculates that "it is possible" that he looked for a copy of the network directory in the "training room of the Wal–Mart Supercenter" where he worked and was unable to locate one. (*See id.*, ¶¶ 5–9.) In any event, the plaintiffs' attorney was unable to obtain a network directory until April 2003, when it was produced in connection with the instant litigation. (*See* filing 92, Ex. 5.)

ERISA provides,

Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in

the amount of up to $100 a day [23] from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. 29 U.S.C. § 1132(c)(1)(B). The plaintiffs argue that the defendants' failure to provide a copy of the network directory violates this statute. Their argument involves several steps. (*See* filing 79 at 3–4; filing 91 at 56–57.) First, the plaintiffs note correctly that pursuant to 29 U.S.C. §§ 1022 and 1024(b)(4), the defendants were required to furnish a copy of the SPD at the plaintiffs' request. Second, the plaintiffs again note correctly that pursuant to 29 U.S.C. § 1022(b), an SPD "shall contain ... the identity of any organization through which benefits are provided." Third, the plaintiffs argue that in light of this language, an SPD must contain a list of medical providers that participate in the plan. (*See* filing 91 at 57.) Finally, although there is no dispute that the defendants did provide the plaintiffs with an SPD upon request, the SPD did not contain the list of participating medical providers. Therefore, according to the plaintiffs, the defendants' failure to provide a copy of the network directory along with the SPD violated § 1022, which in turn subjects the defendants to the penalties outlined in § 1132(c)(1)(B).

■ The plaintiffs' argument hinges upon whether an SPD must contain a list of the medical providers that participate in the Plan. The plaintiffs have identified no authority that supports this proposition, and I do not agree that the phrase, "the identity of any organization through which benefits are provided," 29 U.S.C. § 1022(b), means "the identity of the medical providers that participate in the Plan." It seems to me that the medical providers that participate in the Plan provide medi-

cal services, not benefits. Benefits are provided through the Plan, and in some cases, through various "HMO/POS plans." (*See* A.R., filing 32, at 167 42, 155–57; *see also id.* at 167 169 ("The purpose of the Plan is to provide Participants and Beneficiaries certain welfare benefits described herein.").) In short, the defendants' failure to list all participating medical providers in their SPD does not violate § 1022(b).

■ Citing *Doe v. Travelers Insurance Co.*, 971 F.Supp. 623 (D.Mass.1997), *rev'd in part*, 167 F.3d 53 (1st Cir.1999), the plaintiffs argue that due to the defendants' failure to provide the network directory, Ms. Cossey could not know " 'exactly where she stood' on the issue of whether Timber Ridge Ranch [neurorehabilitation hospital] was in in-network provider whose charges would be covered by the plan." (Filing 79 at 5.) However, it is not apparent that the plaintiffs could not have obtained a copy of the network directory simply by following the instructions in the SPD, and as Ms. Cossey did receive treatment at Timber Ridge Ranch, there is no evidence that she was prejudiced by the defendants' failure to provide the directory along with the SPD, *see Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir.1999) (noting that courts have generally looked at the prejudice to the plaintiff when assessing penalties, though prejudice is not a prerequisite to an award of penalties).

In sum, I conclude that the defendants are entitled to summary judgment on each of the plaintiffs' statutory penalty claims.

**IT IS ORDERED** that:

§ 2575.502c–1.

---

**23.** The maximum daily penalty has been increased to $110 per day. *See* 29 C.F.R.

1.  The plaintiffs' motion for summary judgment, filing 91, is granted in part;

2.  For the reasons set forth in the memorandum accompanying this order, the defendants' decision to deny the plaintiffs' claims for benefits was not reasonable;

3.  The defendants' supplemental motion to affirm the determination of the Administrative Committee, filing 105, is granted insofar as it concerns the plaintiffs' statutory penalty claims;

4.  In all other respects, filings 91 and 105 and their supplements, (*see, e.g.,* filings 114, 133, and 134), are denied;

5.  The defendants' motion to affirm the determination of the Administrative Committee, filing 18, is denied; and

6.  The defendants' motion for summary judgment on the plaintiffs' statutory penalty claims, filing 67, is granted;