# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1695

_____

Randy Erven, et al.,[*]

    Plaintiffs - Appellants,

    v.

Blandin Paper Company, a Minnesota
corporation; Blandin Paper Company
Employees' Retirement Plan,

    Defendants - Appellees.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* District of Minnesota.
\*
\*
\*
\*
\*

_____

Submitted: October 14, 2005
Filed: January 22, 2007

_____

Before RILEY, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Several participants in the Blandin Paper Company Employees' Retirement Plan ("the Plan") sued Blandin Paper Company and the Plan for improperly calculating lump sum benefits in violation of ERISA. 29 U.S.C. § 1132(a)(1)(B). The parties filed cross-motions for summary judgment, and the district court granted

_____

[*]An official caption containing a complete list of parties is on file and available for inspection in the Office of the Clerk of Court, United States Court of Appeals for the Eighth Circuit.

summary judgment in favor of Blandin and the Plan. The participants appeal, and we affirm in part and reverse in part.

## I.

Blandin established the Plan in 1950 with the purpose of providing eligible employees with pensions upon retirement. On December 31, 2002, Blandin froze the Plan, meaning that the Plan would not accept new participants and that existing participants would no longer accrue benefits under the Plan. A few weeks later, the company terminated the Plan, giving each participant the option of transferring a lump sum into an account in the company's 401(k) program. At all relevant times, the Plan was a defined benefit pension plan governed by ERISA. 29 U.S.C. § 1003. Under the terms of the Plan, Blandin served as plan administrator, and its CEO was responsible for managing the Plan. The Plan allowed the CEO to delegate this responsibility to an "administrative manager." Section 3.3 of the Plan provided the administrative manager with discretion to interpret and administer the Plan, including the power to make rules and regulations necessary for the Plan's administration.

On July 1, 1989, the Plan was amended to allow participants to receive a lump sum distribution upon retirement. A participant electing to receive a lump sum would receive a single payment equal to the projected value of the monthly annuity that the Plan otherwise would pay. Because annuity payments would be made until the participants died, the amount of the lump sum depended on the assumptions that the Plan made about the participant's life expectancy. In making this calculation, the Plan's language directed the administrator to rely on actuarial tables published by the Pension Benefit Guaranty Corporation ("PBGC"). The Plan initially stated that the mortality assumptions used in calculating lump sums "shall be those applicable for healthy male lives for Plan terminations on the August 1 of the Plan Year in which equivalence is to be determined." (Appellants' App. at 85 (hereafter "App.")). On August 29, 1997, the Plan was amended, and the new version stated:

> Lump sum payment amounts shall be . . . the present value of the Participant's life only annuity . . . applying Pension Benefit Guaranty Corporation assumptions that are applicable for healthy male lives for termination of insufficient trusteed single employer plans, on the August 1 of the Plan year in which the benefit distribution is to be made.

(App. at 236). Each Plan year began on August 1. Thus, the mortality assumptions applicable on August 1 would apply to all distributions made in the twelve months that followed.

A group of participants brought suit challenging the Plan administrator's method of calculating lump sums. The participants argue that amendments to the PBGC's regulations in 1993 changed the applicable mortality assumptions, and that the administrator used an obsolete table, which was less favorable to the participants, in calculating their lump sums. The participants fall into two groups. One group consists of former employees who retired after August 1, 1994, and elected to receive a lump sum distribution instead of monthly annuity payments. The second group consists of current or recently retired employees who opted to transfer a lump sum amount into their 401(k) accounts upon termination of the Plan in November 2003.

This dispute turns on which mortality table the Plan administrator was permitted to use in calculating lump sum benefits. Blandin argues that it was reasonable throughout the period from 1994 to 2003 for the Plan to apply the mortality assumptions set forth in Table I of Appendix A to 29 C.F.R. Part 2619 (1993) ("Table I"), which applied to "healthy male lives," even though the table ceased to be included in the Code of Federal Regulations in 1996. The participants argue that a table anticipating later death should have been used as of August 1, 1994, thus resulting in higher lump sum benefits throughout the period from 1994 to 2003. They point to amendments to the PBGC's regulations in 1993 and subsequent years, which they say changed the applicable table for healthy males, and thus made unreasonable the Plan's decision to apply the mortality assumption embodied in the former table.

-3-

II.

The district court granted summary judgment in favor of Blandin and the Plan. This court reviews the grant of summary judgment *de novo*, applying the same standard as the district court. *Shipley v. Arkansas Blue Cross and Blue Shield*, 333 F.3d 898, 901 (8th Cir. 2003). At all relevant times, the Plan provided that the Plan administrator "shall have the power to . . . construe and interpret the Plan whenever necessary to carry out its intent and purpose and to facilitate its administration." (App. at 57, 259). Because the Plan delegates this authority to the administrator, we review the Plan administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Thus, we must decide whether the administrator abused its discretion in using Table I to calculate lump sums between 1994 and the Plan's termination in 2003.

Under the abuse of discretion standard, a Plan administrator's interpretation will stand so long as it is reasonable. *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc). In determining whether an administrator's interpretation of the Plan is reasonable, we consider whether it is inconsistent with the Plan's goals, whether it renders language of the plan meaningless, superfluous, or internally inconsistent, whether it conflicts with the substantive or procedural requirements of ERISA, whether it is inconsistent with prior interpretations of the same words, and whether it is contrary to the Plan's clear language. *Id.*; *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992).

The Plan's language directs the administrator to use PBGC mortality assumptions that are "applicable for healthy male lives" on the preceding August 1 in calculating lump sum payments. (App. at 85, 236). Therefore, in resolving the participants' claims, it is necessary to ascertain which table of mortality assumptions the PBGC would have applied to healthy males when each participant's distribution was made. Because the Plan's language directed the administrator to use mortality

-4-

assumptions that were applicable on the preceding August 1, the Plan requires a periodic updating of mortality assumptions to conform to those used by the PBGC. Our analysis thus focuses on changes in the PBGC's regulations between 1993 and 2003.

All parties agree that Table I supplied the proper mortality assumptions until August 1, 1994. They disagree about whether amendments to the PBGC's regulations in December 1993 changed the applicable mortality assumptions for calculating payments under the Plan. The participants argue that the 1993 amendments effected a one year set-back to all calculations involving Table I, meaning that the PBGC assumed that participants would live an additional year, and that this assumption is incorporated through the Plan's reference to PBGC assumptions that apply to Plan terminations. Blandin contends that the one year set-back governed only lump sum payments by the PBGC of less than $3,500, and that it did not apply to payments under the Plan.[2]

These arguments reflect the two functions served by the PBGC's mortality tables, described in summary fashion as "the employer liability function" and "the *de minimis* function." The employer liability function is implicated when the PBGC calculates the present value of promised benefits for a terminating plan. *See* 29 C.F.R. § 2619.1 (1992); *id.* § 4044.1 (1996). Prior to 1997, the Blandin Plan provided that

---

[2]The participants contend that Blandin's argument was not given as a reason for the denial of benefits during the administrative process, and that it is the sort of "post hoc rationalization" that we rejected in *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998), and *Short v. Central States, Southeast and Southwest Areas Pension Fund*, 729 F.2d 567, 571 (8th Cir. 1984). We conclude that Blandin's rationale may be considered, however, because although the legal argument in litigation is more sophisticated than the denial letter, it is generally consistent with the administrator's statement that the 1993 regulatory amendments did not affect the applicability of Table I as a legal matter, and, as our dissenting colleague observes, *post* at 15, the argument presents a pure question of law.

lump sum payments would be calculated based on PBGC assumptions "for Plan terminations." (App. at 85). After 1997, the applicable assumptions were those "for terminations of insufficient trusteed single employer plans." (*Id.* at 236). Because the Plan explicitly contemplates using the applicable PBGC assumptions for terminating trusteed plans, changes in the assumptions that govern the PBGC's employer liability function affect the amount of lump sum payments under the Plan. *See* 29 C.F.R. § 2619.41 (1992); *id.* § 4044.41(a)(1) (1996). The *de minimis* function, by contrast, involves calculating the value of guaranteed benefits due under a terminated plan to ascertain whether the benefits are payable as a lump sum rather than as an annuity. *See* 29 C.F.R. § 2613.8 (1992); *id.* § 4022.7(b)(1) (1996). Changes to the PBGC assumptions that affect only the *de minimis* function are not incorporated into the Plan.

The participants argue that the one year set-back adopted by the PBGC in 1993 applied to both functions, while Blandin maintains that the set-back applied only to the *de minimis* function. Because we find the 1993 regulation ambiguous concerning whether it applied to the employer liability function, we conclude that the Plan administrator did not abuse its discretion in refusing to use the set-back table as of August 1, 1994. We agree with the participants, however, that the administrator abused its discretion by failing to use the new table after the regulations were clarified on August 1, 1996.

A.

In January 1993, the PBGC published a proposed rule that would change the applicable mortality assumptions to be used in calculating *de minimis* lump sums by implementing a one-year set-back, but would not affect the computation of other lump sum benefits:

For determining whether the value of a participant's benefit is $3,500 or less under § 2613.8(b)(1) and, *if so*, for calculating the value of the benefit, the PBGC will employ the mortality assumptions obtained from Tables I through VI of this appendix by substituting *x+1* for *x* throughout the male mortality table associated with the participant's health status.

Valuation of Plan Benefits in Single-Employer Plans, 58 Fed. Reg. 5128, 5138 (proposed Jan. 19, 1993) (to be codified at 29 C.F.R. pt. 2619, App. A) (emphasis added). In September 1993, the PBGC promulgated a final rule, declaring that as far as mortality assumptions were concerned, "[t]he final rule implements the change published in the proposed rule." 58 Fed. Reg. at 50,814. The summary of the final rule, consistent with the text of the proposed rule, indicated that the changes in mortality assumptions applied only to *de minimis* calculations and not to calculations of an employer's liability:

> [T]he PBGC is adopting unisex mortality assumptions when it is calculating de minimis lump sums (*i.e.*, those of $3,500 or less) to be paid to a participant; the PBGC is otherwise reserving the lump sum issue and therefore will otherwise continue to use its existing mortality assumptions and interest rate structure in the valuation of lump sum benefits.

Valuation of Plan Benefits in Single-Employer Plans, 58 Fed. Reg. 50,812, 50,812 (Sept. 28, 1993).

The text of the final rule, however, was a modified version of the proposed rule, and the alteration gives rise to the participants' argument that the 1993 rule changed the mortality assumptions applicable to the employer liability function. The language of the final rule declared that the set-back applied to determining "whether the value of a benefit is $3,500 or less . . . and for calculating the value of a lump sum benefit," without including the "if so" language between the two clauses. 58 Fed. Reg. at

50,821 (to be codified at 29 C.F.R. Part 2619, Appendix A). If the PBGC had simply adopted the language of the proposed rule, as the summary of the final rule suggested, it would be clear that the one year set-back applied only to the *de minimis* function. But the final rule omitted the "if so" language of the proposed rule, and thus suggested that the one year set-back might apply to both functions. Thus, the Plan administrator was left to decide whether, as the summary indicated, the final rule implemented the proposed rule and "otherwise" reserved the lump sum issue (including with respect to the employer liability function), or whether it also governed calculations of an employer's liability, as one might infer from the text of the preamble to Table I, standing alone.

The participants argue that there was no genuine ambiguity here, but only a difficult question that required a sophisticated understanding of the regulations. We disagree. Although later developments made clear that Table I no longer applied to lump sum calculations, as of August 1, 1994, the Plan administrator had available only the proposed 1993 rule, the final summary provided by the PBGC, and the text of the final 1993 rule. The summary of the final rule declared that the unisex mortality table applied to *de minimis* calculations, while the PBGC "otherwise" reserved the lump sum issue, and would "continue to use its existing mortality assumptions and interest rate structure in the valuation of lump sum benefits." 58 Fed. Reg. at 50,812. In light of this summary, and its reference to implementation of a proposed rule that applied only to *de minimis* calculations, the language of the final rule indicating that the set-back applied to "calculating the value of a lump sum benefit" is **ambiguous. In context, it is unclear whether this language applies to *all* lump sums or only to calculating the lump sum payout of the *de minimis* benefits described in the preceding clause. Taking the administrative pronouncements as a whole, a** reasonable administrator could conclude that the set-back described in the preamble to Table I applied only to *de minimis* calculations, and did not change the applicability of the table to all lump sums. Accordingly, the Plan administrator did not abuse its

discretion in concluding that the set-back applied only to the *de minimis* function as of August 1, 1994.

B.

The district court ended its analysis with the 1993 changes to the PBGC regulations. Subsequent amendments to the regulations, however, make clear that Table I ceased to be the "applicable" table for healthy male lives by August 1, 1996. As part of a reorganization and clarification of its regulations in July 1996, the PBGC incorporated the one year set-back into the body of the table, and deleted the ambiguous language in the table's preamble. 29 C.F.R. pt. 4044, App. A, Table 3 (1996) ("Table 3"). The renumbered regulations repeatedly point to Table 3 as the only table to be used by trusteed plans, including terminated plans, when making lump sum calculations. 29 C.F.R. §§ 4044.41(a)(1), 4044.52(b), 4044.54 (1996). As of 1996, Table I no longer appeared in the Code of Federal Regulations, and no reasonable Plan administrator could conclude that it supplied the "applicable" mortality assumptions for healthy male participants.

Blandin argues that it was reasonable for the administrator to continue using Table I even after it was removed from the Code of Federal Regulations in 1996, because the Plan called for applying "Pension Benefit Guaranty Corporation assumptions that are applicable for *healthy male lives*," (App. at 236) (emphasis added), while the replacement table adopted unisex mortality assumptions that did not apply *exclusively* to males. Blandin's interpretation conflicts with the plain language of the Plan and is therefore an abuse of discretion. *See Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006); *Cooper Tire & Rubber Co. v. St. Paul Fire and Marine Ins. Co.*, 48 F.3d 365, 371 (8th Cir. 1995). Despite the broader applicability of the replacement table, the PBGC's unisex mortality assumptions unambiguously supplied the applicable mortality assumptions "for healthy male lives." The Plan requires the administrator to use PBGC mortality assumptions that apply to healthy

-9-

male lives, and it cannot reasonably be interpreted to require that these assumptions apply exclusively to healthy males. Thus, by August 1, 1996, it was clear that the set-back table governed lump sum calculations under the Plan. As of this date, the Plan administrator abused its discretion by using an inapplicable table, and the participants are entitled to summary judgment on their claim that the administrator should have applied Table 3 to all lump sum valuations after August 1, 1996.[3]

\*　　\*　　\*

For the foregoing reasons, the district court's judgment is affirmed in part and reversed in part.

JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part.

The court holds that the Plan Administrator did not abuse its discretion in its calculations of lump sum benefit payments between August 1, 1994, and August 1, 1996. The court further concludes that, as of August 1, 1996, the actuarial table the Administrator was using was inapplicable and the Administrator's continued reliance on it was in conflict with Plan language. I agree that the Administrator abused its discretion as of August 1, 1996, and therefore I concur in part B. of the court's opinion. Because I conclude that the 1993 regulatory amendments applied to the Plan as of August 1, 1994, and the Administrator's failure to apply the changes was an abuse of discretion, I dissent from part A. of the court's opinion.

---

[3]The PBGC amended the mortality tables again in 2000. *See* Valuation of Benefits; Use of Single Set of Assumptions for All Benefits, 65 Fed. Reg. 14,752 (Mar. 17, 2000) (codified at 29 C.F.R. § 4044.53(c)(1) (2000); 29 C.F.R. pt. 4044, App. A, Table 1 (2000)). Although the plaintiffs have not cited or discussed the table created by the 2000 amendments, it appears to supply the applicable mortality assumptions for calculating lump sum payments in plan years after August 1, 2000.

Plain language and simple logic reveal that the 1993 regulatory amendments are applicable to this case and that plaintiffs are entitled to the one year set-back in calculating their benefits. Part 2619 of the Pension Benefit Guaranty Corporation regulations governed the valuation of plan benefits in single-employer plans. Subpart C, entitled "Trusteed Plans," was largely reshaped by the 1993 amendments. It began with the following section:

> 2619.41 Purpose and scope.
>
> This subpart sets forth the rules for calculating the value of a benefit to be paid a participant or beneficiary under a terminating pension plan that has been or will be placed into trusteeship by the PBGC. Sections 2619.43 – 2619.48 set forth rules for calculating the value of a benefit to be paid as a lump sum. Section 2619.49 sets forth rules for calculating benefits to be paid as an annuity.

29 C.F.R. § 2619.41 (1994). Contrary to the text of Section 2619.41, however, the rules for calculating lump sum benefits were actually found in Section 2619.49. Sections 2619.43 through 2619.48 discussed mathematical symbols and terms (§ 2619.43), immediate annuities (§ 2619.44), deferred annuities (§ 2619.45), early retirement benefits (§ 2619.46), death benefits (§ 2619.47), and withdrawal of employee contributions (§ 2619.48). Section 2619.49 was entitled "Valuation of benefits to be paid as annuities," but it contained the only reference to mortality tables for lump sum payments:

> (a) General rule. . . .
>
> For valuing benefits to be paid as lump sums, and for determining whether the lump sum value of a benefit exceeds $3,500, the plan administrator shall value benefits in the same manner as benefits to be paid as annuities except that the mortality assumptions set forth in Tables I through VI of appendix A to this part . . . shall apply . . . .

29 C.F.R. § 2619.49. Table I of Appendix A, the table the Administrator had always used to calculate lump sum payments, thus continued to be applicable because it was the only one published by the Pension Benefit Guaranty Corporation for healthy male lives and the Plan, of course, specified assumptions for healthy male lives. Table I retained its title as "Mortality Rates for Healthy Male Participants," and in fact it was exactly the same table as was in use before the 1993 amendments. Compare 29 C.F.R. pt. 2619, app. A, Table I (1992) with 29 C.F.R. pt. 2619, app. A, Table I (1994). The only difference between the pre-1993 table and the one adopted in 1993 is that lump sum payments gained a one year set-back in the new version through amended language in the preamble to the Mortality Rate Tables:

> For determining whether the value of a benefit is $3,500 or less under § 2613.8(b)(1) and for calculating the value of a lump sum benefit, the PBGC will employ the mortality assumptions set out in Tables I through VI of this Appendix by substituting $x+1$ for $x$ throughout the appropriate male mortality table. The Tables provide, for each age (denoted by $x$), the probability that a person assumed to be living at that age will not survive to attain age $x+1$.

29 C.F.R. pt. 2619, app. A, Table I (1994). As a result, Table I now assumed individuals would live one year longer than before, thereby increasing lump sum payments.

The 1993 regulatory amendments not only added the one year set-back in calculating benefits, but they also directed that Table I (though titled "Healthy Male Participants") be the source of unisex calculations for the payment of lump sum benefits. 58 Fed. Reg. 50,812 (Sept. 28, 1993). The Pension Benefit Guaranty Corporation stated the following in the Background section of the announcement of the final rule changes:

> [U]nder the proposed regulation, the PBGC would continue to value lump sums under trusteed plans using its historical assumptions, except that its mortality assumption would be from a unisex table . . . .

58 Fed. Reg. 50,812 (Sept. 28, 1993). The announcement recounted comments that had been made following the publication of the proposed rule changes and repeated this conclusion:

> Two commenters addressed the desirability of adopting unisex mortality assumptions for lump sum valuations in PBGC-trusteed plans; both favored the proposed change. The final rule implements the change published in the proposed rule.

58 Fed. Reg. 50,814 (Sept. 28, 1993). This explains the directive in the preamble to the Mortality Rate Tables that calculations for benefits for "a person" would be based on "the appropriate male mortality table."[3]

To summarize, the 1993 amendments left Table I in place but added a one year set-back to the calculation and made the table applicable to both men and women. Although the Plan continued to use Table I, it did not follow the regulatory change that added one year to the mortality assumptions in calculating benefits. The Plan has never claimed regulatory ambiguity as a reason for its refusal to add the one year set-

---

[3]The Plan adopts the assumptions for healthy male participants, thereby distinguishing from assumptions for disabled male participants. The preamble's use of the phrase "appropriate male mortality table" recognizes that there were two kinds of tables.

The Pension Benefit Guaranty Corporation continued to publish analogous tables for female participants because those tables were still used in calculating benefits paid as annuities. The female tables were not to be used for lump sum payments because the preamble to the Mortality Rate Tables directed that lump sum payments only would be determined through use of a unisex table.

back. However, the court now holds the Administrator's conduct was reasonable because the "administrative pronouncements as a whole" are ambiguous. The record reveals that the Plan asserted a much more simplistic explanation during the administrative appeal process that documents the Administrator's explanations of its conduct.

The Blandin Plan directs the Administrator to calculate lump sum benefits using the Pension Benefit Guaranty Corporation assumptions that are applicable for healthy male lives for terminations of trusteed single employer plans with insufficient funds. Citing that language, the Participants made a claim for additional benefits on the ground that the "applicable" assumptions changed with the adoption of the one year set-back effective August 1, 1994. In its letter denying the Participants' claim for additional benefits, the Administrator acknowledged that the Pension Benefit Guaranty Corporation had changed its assumptions so that the "Healthy Male Table" no longer existed, but stated that it had exercised its discretion to continue using the old Table I because the Plan contained a reference to "healthy male participants." In this 2003 letter, the Administrator did not distinguish between the regulatory amendments of 1993 and 1996. The Administrator also wrote that "an additional indication of the intent of the Plan language" was found in a labor contract between the Company and some of its unionized employees because it contained a lump sum example that used the original Table I.

The Participants appealed that denial, and the Administrator once again denied the claim. This time, the Administrator specifically acknowledged that the original Table I entitled "Mortality Rates for Healthy Male Participants" no longer existed and that it "became necessary to interpret the [Plan language] to supply a mortality table." Without explaining how or why it had arrived at its interpretation, the Administrator wrote that its "continued use of the same historical mortality table" had resulted in the plan having been "administered uniformly as to all participants, in all years." The Plan asserts that its decision provided consistent benefits over time between

participants, but the Plan calls for the Administrator to use "applicable" assumptions rather than the same assumptions.

The letter offered no new or repeated basis for its denial, but it contained a curious statement that "the PBGC no longer covers terminations of trusteed single employer plans with insufficient assets; rather, the PBGC covers pension plan terminations on either a voluntary termination basis or a distress termination basis." That statement is simply incorrect. The agency still covers the termination of trusteed single employer plans with insufficient assets. See 29 C.F.R. § 4044.1(b) (valuation of benefits necessary to determine amount of plan asset insufficiency); § 4044.2(b) ("Trusteed plan means a single-employer plan which has been placed into trusteeship by PBGC."). In addition, the statute had spoken of voluntary and distress terminations since 1986, so no new terminology was introduced that would have justified the Administrator's position. See Single-Employer Pension Plan Amendments Act of 1986, Pub. L. No. 99-272, § 11007, 1986 U.S.C.C.A.N. (100 Stat.) 244. Although the record does not supply this detail, it is possible that this erroneous understanding of the regulations contributed to the Administrator's denial of the claim.

The administrative record leads me to conclude that the Administrator's proffered reason(s) for rejecting the Participants' claim had no legal basis. The Administrator did not assert during the claim appeal process that its decision was rooted in regulatory interpretation that the 1993 amendments affected only the de minimis function. The Administrator now relies on that as its only argument in favor of its decision being consistent with the Plan language. I have addressed the argument because it is a question of law, but I note the complete discrepancy between the Administrator's proffered reasons for denial in the claims process and in this lawsuit. I am particularly unimpressed by the Administrator's earlier argument that it was justified in continuing to rely on Table I because the table's title contained the phrase "healthy male lives" and the Plan used the words "healthy" and "male," where the regulations made it clear that Table 3 (the applicable table as of 1996) applied to both

males and females regardless of its title. The Administrator's interpretation was contrary to the clear language of the Plan, see Lickteig v. Bus. Men's Assurance Co. of Am., 61 F.3d 579, 584-85 (8th Cir. 1995), and was not a result of ambiguous regulatory language.

The court cites but does not apply the analysis of Finley v. Special Agents Mutual Benefit Association, Inc., 957 F.2d 617, 621 (8th Cir. 1992), in its discussion of the reasonableness of the Administrator's conduct. Our review is limited to the record that the Administrator considered when it denied the Participants' claims for additional benefits, and we are not to substitute our weighing of the evidence for that of the Administrator. Farley v. Arkansas Blue Cross & Blue Shield, 147 F.3d 774, 777 (8th Cir. 1998). We are also guided by a corollary directive that we are not to consider post hoc rationales for the Administrator's determination. Short v. Cent. States, S.E. & S.W. Areas Pension Fund, 729 F.2d 567, 575 (8th Cir. 1984).

I have already answered the ultimate question, whether the Administrator's interpretation is contrary to the clear language of the Plan. See Lickteig, 61 F.3d at 584-85. There are other parts to the Finley test. Id. at 584. The first asks whether the interpretation was consistent with the goals of the Plan, and I conclude that neither side receives a benefit from this question. The Participants suggest that the Plan's tax qualification is in jeopardy without evidence to support the assertion.

The second part of the Finley test addresses whether the interpretation renders any language in the Plan meaningless or internally inconsistent. In this case, this question is redundant with the one I have already decided: the interpretation rendered meaningless the word "applicable" because the Administrator chose to continue using an outdated and later nonexistent table.

The third part of the Finley test asks if there is a conflict with the substantive and procedural requirements of ERISA. The Participants argue that the Plan violated

-16-

ERISA's requirement that a plan document be clear enough to determine rights under it, while the Plan argues that no ERISA provision is at issue. ERISA contains a number of precatory words that arguably could apply, but the primary issue here is not one of compliance with ERISA. The Administrator's decision does not conflict with the requirements of the ERISA statute in a manner or to a degree that affects the outcome of this case.

The last part of the test is whether the words at issue have been interpreted consistently. As noted above, the Plan argues that it has applied the Plan consistently by ignoring the changes to the tables. That is not the sort of consistency that the law requires, however. The issue is what table was applicable to participants at the time of their retirement, and that answer changed over time. Accordingly, the Administrator has not interpreted the relevant words consistently.

To summarize, I conclude that the Administrator's interpretation of which mortality table was "applicable" to the calculation of lump sum benefits as of August 1, 1994, was contrary to the clear language of the Plan and rendered that same language meaningless. Moreover, the Administrator has failed to consistently interpret the Plan's provision so that participants who have chosen lump sum benefits between 1994 and 1996 have been shortchanged. Taken together, these shortcomings render the actions unreasonable.

Because I conclude that the Blandin Paper Company Employees' Retirement Plan, through its Administrator, abused its discretion by failing to calculate lump sum benefits correctly as of August 1, 1994, I would reverse the district court judgment.

I concur in Part B. of the court's opinion and dissent from Part A.
_____