# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2285

_____

|  |  |  |
|---|---|---|
| | * | |
| Administrative Committee of the | * | |
| Wal-Mart Stores, Inc. Associates' | * | |
| Health and Welfare Plan, | * | Appeal from the United States |
| | * | District Court for the |
| Appellant, | * | Western District of Arkansas. |
| | * | |
| v. | * | [PUBLISHED] |
| | * | |
| Nancy Lynn Gamboa; Baudelio | * | |
| Jose Gamboa; Wendy Aurora | * | |
| Gamboa; Lucas Tizoe Gamboa, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: November 15, 2006
Filed: March 7, 2007

_____

Before RILEY, HANSEN, and SMITH, Circuit Judges.

_____

HANSEN, Circuit Judge.

The Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan ("the Administrative Committee") appeals the district court's grant

of summary judgment to the Gamboas, refusing to enforce a reimbursement provision in Wal-Mart's health benefits plan. We reverse and remand for further proceedings.

## I.

For the benefit of its employees and their dependents, Wal-Mart established and maintains a self-funded, ERISA-covered health and welfare plan ("the Plan"). The Plan is governed by the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan Wrap Document ("the Plan Wrap Document"), amended and restated on January 1, 2001. That document defines the Plan as the Plan Wrap Document plus "each Welfare Program incorporated hereunder by reference," and a "Welfare Program" is a "written arrangement . . . incorporated into this Plan by identification in Appendix A." (Appellant's App. at 195.) Appendix A references a welfare program entitled, "Wal-Mart Associates' Group Health Plan." Health benefits are provided to Wal-Mart associates and their beneficiaries as listed in the Associate Benefits Book, which is distributed to employees. The Plan Wrap Document expressly provides the Administrative Committee, as the plan administrator, with complete discretion to interpret the Plan provisions. (Id. at 198.)

In 2002, while Nancy Gamboa was a Wal-Mart employee covered under the Plan, a drunk driver collided with the Gamboas' car, causing serious injuries to Nancy and her family. Her husband, Jose, is now permanently disabled as a result of injuries sustained in the accident. Pursuant to the benefits listed in the 2002 Associate Benefits Book, subtitled, "Summary Plan Description," the Administrative Committee paid health care benefits totaling $177,136 on Jose's behalf. The Gamboas filed a dram shop action for damages, and in December 2004, Nancy, Wendy, and Lucas Gamboa all settled their individual claims against the tortfeasor for a total of $1 million. In consideration for the settlement proceeds paid to those family members, Jose executed a written release of his claims arising from the accident.

The Administrative Committee sought reimbursement from the settlement proceeds for the benefits it had paid on behalf of Jose, relying on a provision in the Associate Benefits Book that gives the Plan the right to "recover or subrogate 100 percent of the benefits paid or to be paid by the Plan for covered persons" where there has been a "judgment, settlement or payment made or to be made, because of an accident." (Id. at 189.) The Associate Benefits Book also obligates covered persons "to cooperate in order to guarantee reimbursement to the Plan." (Id.) The Gamboas refused to reimburse the Plan out of the settlement proceeds, asserting that Jose's written release rendered the settlement proceeds solely for the benefit of his wife and children. The Administrative Committee rejected this argument, asserting that the Associate Benefits Book clearly creates a right of reimbursement whenever settlement proceeds are paid "because of an accident," as occurred in this case.

The Administrative Committee filed suit in federal court seeking equitable relief to enforce its right of reimbursement as set forth in the Plan. See 29 U.S.C. § 1132(a)(3)(B)(ii) (authorizing a participant, beneficiary, or fiduciary to file a civil action to obtain appropriate equitable relief in order to enforce any provision of ERISA or the terms of a plan); see also Admin. Comm. of Wal-Mart v. Varco, 338 F.3d 680, 686-88 (7th Cir. 2003) (holding the court had subject matter jurisdiction over Committee's claim for restitution out of a participant's recovery of damages in state court), cert. denied, 542 U.S. 945 (2004). The Gamboas continued to assert Jose's release of any claim to the settlement proceeds as a bar to reimbursement. Additionally, the Gamboas claimed for the first time that the reimbursement provision was not officially part of the Plan because it was found only in the Associate Benefits Book, not in the formal Plan Wrap Document. The Administrative Committee issued a letter setting forth its interpretation that the terms of the group health plan are contained in both the Plan Wrap Document and the medical section of the Associate Benefits Book, which includes not only the participant's right to payment of benefits but the corresponding obligation to reimburse the Plan for judgments or settlements obtained because of an accident.

The district court refused to enforce the Administrative Committee's decision to seek reimbursement as provided in the Associate Benefits Book. The district court concluded that the Associate Benefits Book did not fit within the Plan Wrap Document's definition of a Welfare Program, and thus, the Committee's decision to treat it as a plan document was contrary to the plain language of the Plan Wrap Document. The court granted summary judgment to the Gamboas and dismissed the case with prejudice. The Administrative Committee appeals, arguing that the district court erred in not deferring to its reasonable interpretation of the Plan.

## II.

We review the grant of summary judgment *de novo*, using the same standard as the district court, and we view the evidence in the light most favorable to the nonmoving party. See Alliant Techsystems, Inc. v. Marks, 465 F.3d 864, 867 (8th Cir. 2006). Summary judgment is appropriate if the evidence of record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Plan Wrap Document gives the Administrative Committee, as the plan administrator, complete discretion to interpret the terms of the Plan. Accordingly, we are limited to reviewing the Administrative Committee's interpretation of the Plan for an abuse of discretion. See Kennedy v. Ga. Pac. Corp., 31 F.3d 606, 609 (8th Cir. 1994) (stating, "[w]e review de novo the district court's application of the abuse of discretion standard" to a plan administrator's interpretation of an employee benefit plan). Where the plan administrator offers a reasonable interpretation of a plan, the district court should not substitute a different, though also reasonable, interpretation that could have been made. See Clapp v. Citibank, N.A. Disability Plan (501), 262 F.3d 820, 828 (8th Cir. 2001); Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997). "In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable

person *would* have reached that decision."   Groves v. Metro. Life Ins. Co., 438 F.3d 872, 875 (8th Cir. 2006) (internal quotation marks omitted).

"We look to the law of trusts when interpreting ERISA plan documents." Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002).  We interpret the terms of a written arrangement by considering "'the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.'"  Id. (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,  112 (1989)).  We thus begin with the language of the Plan.  An interpretation that conflicts with the plain language of a health and welfare plan is an abuse of discretion, see Erven v. Blandin Paper Co., 473 F.3d 903, 909 (8th Cir. 2007), but identifying "the plan" is not always a clear-cut task. "[O]ften the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as 'the plan.'"  Health Cost Controls of Ill. v. Washington, 187 F.3d 703, 712 (7th Cir. 1999), cert. denied, 528 U.S. 1136 (2000).  Unfortunately, "[t]his kind of confusion is all too common in ERISA land."  Id.  Where a plan contains uncertain terms, this court will not disturb the plan administrator's interpretation of the plan, as long as it is reasonable.  Riddell v. Unum Life Ins. Co. of Am., 457 F.3d 861, 864-65 (8th Cir. 2006).   Our reasonableness review of a plan administrator's interpretation is informed by the Finley factors, see Finley v. Special Agents Mut. Benefits Ass'n, 957 F.2d 617, 621 (8th Cir. 1992), which guide us to consider whether the interpretation contradicts the plan's clear language, whether the interpretation renders any plan language internally inconsistent or meaningless, whether the administrator has interpreted the words at issue consistently, whether the interpretation is consistent with the plan's goals, and whether the interpretation conflicts with any substantive or procedural requirements of ERISA.  Riddell, 457 F.3d at 864.

On the face of the Plan Wrap Document, Wal-Mart appears to have attempted to eliminate ERISA land confusion in identifying the plan documents.  The Plan Wrap

Document provides the governing structure of the overall Plan and describes the general procedures for determining participation, funding, administration, and claims under each individual welfare program to be established by the employer. It provides that the Plan consists of the Plan Wrap Document, together with each individual "Welfare Program" established by the employer. The Plan Wrap Document defines welfare program in relevant part as follows:

> "<u>Welfare Program</u>" means a written arrangement that is offered by one or more Employers and incorporated into this Plan by identification in Appendix A and which provides any employee benefit that would be treated as an "employee welfare benefit plan" under Section 3(1) of ERISA if offered separately. . . . For purposes of this Plan, only the terms of the formal plan document of each such arrangement [are] incorporated herein. Where no separate formal plan document exists, the plan document shall consist of any applicable insurance policy or contract and the applicable description of such benefits contained in the Associate Benefits Book, as modified from time to time, to the extent consistent with any applicable insurance policy or contract.

(Appellant's App. at 195-96.) The first welfare program listed in Appendix A is the "Wal-Mart Associates' Group Health Plan."

The district court reasoned that the plain language of the Plan Wrap Document requires a welfare program to be established by either (1) a formal written arrangement listed by name in Appendix A, or (2) where there is no formal document, an applicable insurance contract or policy, plus its description in the Associate Benefits Book. The district court reasoned that the reimbursement provision is not part of the Plan because it exists only in the Associate Benefits Book, which is a summary plan description not specifically listed as a welfare program in Appendix A, and it does not accompany an applicable insurance policy or contract. The district court adopted the reasoning set forth in <u>Cossey v. Assocs.' Health and Welfare Plan</u>, 363 F. Supp. 2d 1115, 1130-36 (E.D. Ark. 2005), and in that court's denial of

reconsideration, No. 4:02CV661, 2005 WL 3133500 (E.D. Ark. Nov. 21, 2005) (analyzing the same Wal-Mart plan provisions and concluding that the Associate Benefits Book, a summary plan description, is not a formal plan document because it was not specifically listed in Appendix A and it could not be deemed a plan document because it did not accompany an insurance policy) (unpublished). The district court thus concluded that the Administrative Committee's decision to treat the Associate Benefits Book, which contains the reimbursement provision, as a plan document was unreasonable because it was contrary to the plain language of the Plan Wrap Document.

We agree with the district court to the extent it concludes that the Associate Benefits Book does not accompany any applicable insurance policy for purposes of this case. Thus, the alternate definition of "Welfare Program" (that is, where no formal document exists but there is an insurance contract, the contract and its description in the Associate Benefits Book comprise the plan documents) is of no avail here where there is no applicable insurance contract. In this case, the Plan did not provide benefits to Jose pursuant to an insurance contract, but pursuant to the terms set forth in a self-funded written arrangement.

We respectfully disagree, however, with the district court's remaining plain language analysis. The plain language of the Plan defining a welfare program as a written arrangement, requires the written arrangement to be incorporated by identification in Appendix A. The first welfare program listed in Appendix A, and the only group health plan listed, is entitled the "Wal-Mart Associates' Group Health Plan." Uncertainty arises because there is no written arrangement bearing this name. In fact, there appears to be no formal written arrangement purporting to be a group health plan, yet group health benefits were paid and are not disputed. This situation presents a latent ambiguity regarding the terms of the group health plan. See Miller v. Taylor Insulation Co., 39 F.3d 755, 760 (7th Cir. 1994) (noting the doctrine of latent ambiguity applies in the ERISA context). "A latent ambiguity arises when the

contract on its face appears clear and unambiguous, but collateral facts exist that make the contract's meaning uncertain." Connect Commc'ns v. Sw. Bell, 467 F.3d 703, 709 (8th Cir. 2006) (internal marks and alteration omitted). In the face of a latent ambiguity, the dispute cannot be resolved by reference to the apparently plain language of the document. We must consider all of the factors listed in Finley.

While not controlling in this circumstance due to the latent ambiguity, the plain language of the Plan Wrap Document does reference a group health plan in Appendix A. It is undisputed that the Plan Wrap Document does not itself provide any substantive health benefits, but that Jose received group health plan benefits pursuant to the Associate Benefits Book, which is a written arrangement and the only existing source of group health benefits. The Administrative Committee's interpretation deeming the Associate Benefits Book to be a plan document is therefore consistent with the Plan Wrap Document's assertion in Appendix A that a group health plan exists.

This interpretation is also consistent with the requirements of ERISA. Absent a written arrangement specifying how benefits are to be paid, no ERISA welfare plan exists. See 29 U.S.C. § 1102(b)(4) (requiring an employee benefit plan to specify the basis on which payments are made to and from the plan). The group health benefits were provided as specified in the Associate Benefits Book, which informs the participants that portions of the book serve as part of the official plan document for the Plan. To hold that the only document providing health benefits is not a plan document would be to inappropriately permit an employer to "avoid the written instrument requirement by treating this written document describing employee benefits as merely a summary of a plan that is nowhere else in writing." Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1208 (2d Cir. 2002). ERISA requires a written arrangement, and no other document exists by which group health benefits are provided. In this situation, the Administrative Committee's interpretation is consistent with the requirements of ERISA. It would be nonsensical to conclude that the plain

language of the Plan requires an interpretation that renders no plan at all under the terms of ERISA.

In our opinion, the label of summary plan description on the Associate Benefits Book is not dispositive. The Plan Wrap Document contemplates a formal plan document, stating, "only the terms of the formal plan document of each such arrangement [are] incorporated herein." (Appellant's App. at 196.) But this case presents a circumstance where there is a welfare program specified but no formal document with the same label, and no source of benefits exists aside from the written Associate Benefits Book. Where no other source of benefits exists, the summary plan description *is* the formal plan document, regardless of its label. See Feifer, 306 F.3d at 1208-09 (rejecting the notion that the program summary was "a non-plan during the period when it was the only written document describing benefits"). This conclusion is consistent with our prior interpretation of ERISA plans. We have often noted that "[s]ummary plan descriptions are considered part of the ERISA plan document." Hughes, 281 F.3d at 790; Barker v. Ceridian Corp., 122 F.3d 628, 633 (8th Cir. 1997); Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994), cert. denied, 514 U.S. 1050 (1995). "An important objective of ERISA was to mandate disclosure to employees," and we have held that the terms of a summary plan description prevail even if they conflict with the provisions of a formal plan because of the importance of disclosing accurate information to employees. Hughes, 281 F.3d at 790. No such conflict exists here because the medical section of the Associate Benefits Book is the only benefit-defining document, and it fulfilled ERISA's disclosure requirements by disclosing both the benefits of the group health plan as well as the participants' corresponding obligation to reimburse the Plan where a judgment or settlement is received on account of an accident.

Thus, regardless of its label as a summary plan description, if a dispute had arisen over the amount of benefits due, the Administrative Committee would no doubt have been bound to provide benefits in accordance with this document. See Groves,

438 F.3d at 874 n.2 (noting "[t]he district court did not abuse its discretion in using the Plan booklet to evaluate the Plan terms" in a suit challenging the denial of benefits). Having received medical benefits in accordance with the Associate Benefits Book, we will not permit a participant to deny the corresponding responsibilities and obligations that are clearly imposed on the participant in the same document – what is good for the goose is good for the gander. See Health Cost Controls, 187 F.3d at 712 ("[H]aving obtained benefits in accordance with the latter agreement, it ill behooves Washington to turn around and deny that the agreement is the authoritative plan document.") We agree with the reasoning articulated by the Seventh Circuit in Health Cost Controls:

> Just as the employee welfare plan would be estopped to set up "the plan itself" as a defense to a claim for benefits if [the participant] had reasonably relied on the language of the summary plan description, so she is estopped to repudiate the plan document on the basis of which she obtained her full benefits, which she wishes to retain.

Id.

Additionally, there is no language in the Plan Wrap Document with which the reimbursement provision of the Associate Benefits Book is internally inconsistent.[1] The Gamboas assert that the Plan Wrap Document limits the Administrative Committee's powers to correcting errors (Appellant's App. at 199, Plan Wrap Document § 4.2 (c)(12)), and argue that requiring the reimbursement of benefits that

---

[1]We note that some circuits have dealt with this Plan and concluded that the Administrative Committee's right to reimbursement is a clear and unambiguous part of the Plan. See, e.g., Admin. Comm. of Wal-Mart Assocs. Health and Welfare Plan v. Willard, 393 F.3d 1119, 1122-24 (10th Cir. 2004); Varco, 338 F.3d at 687. The focus of those cases, however, was on the clarity of the reimbursement provision itself, not precisely the question of whether the Associate Benefits Book is a plan document. Accordingly, those cases are not dispositive of the issue before us.

were properly paid would be contrary to this language. We disagree. The section they reference preserves "without limitation" the Administrative Committee's right to make equitable adjustments for mistakes made in administering the plan and to recover erroneous overpayments in whatever manner the Committee deems appropriate. Further, the same section provides that the Administrative Committee also has "[s]uch other duties or powers provided in a Welfare Program." (Id. at § 4.2(c)(14).) Because a group health plan is identified in Appendix A as a welfare program, and the Administrative Committee reasonably construed the Associate Benefits Book as a plan document for the group health plan, there is no question that the Administrative Committee has the power to seek reimbursement in appropriate circumstances as provided in the Associate Benefits Book. This interpretation is also consistent with the goals of the Plan itself. A self-funded plan generally has limited resources, and the right of reimbursement or subrogation in certain instances "is an extremely important tool for maintaining the financial viability of such plans." Paris v. Iron Workers Trust Fund, No. 99-1558, 2000 WL 384036 at *3 (4th Cir.) (unpublished), cert. denied, 531 F.3d 875 (2000).

Our consideration of the Finley factors convinces us that the Administrative Committee's interpretation was reasonable and not an abuse of discretion.

Finally, while the Associate Benefits Book requires reimbursement of benefits in certain circumstances, the district court never resolved the Gamboas' assertion that reimbursement is not permitted because of Jose's written release, and this issue was not briefed on appeal. Consequently, on remand, the district court is directed to address and rule upon the effect, if any, of Jose's written release, as well as any other remaining affirmative defenses.

## III.

We reverse the judgment of the district court and remand for consideration by the district court in the first instance of any remaining affirmative defenses, including the effect of Jose's written release, and for such further proceedings as are necessary to conclude the litigation in the district court.

_____